FILED
Jan 2, 04

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

~~2003 DEC 33~~ A 10: 12

DISTRICT COURT
HARTFORD CT

HERBERT L. MITCHELL,                    :    CIVIL ACTION NO.

    *Plaintiff*                          :    3:02CV2136(AVC)

V.                                      :

MAURICE COLLIN, TASI VRIGA,             :
EUGENE A. MIGLIARO, JR.,                :
CHRISTOPHER DUNN,                       :

    *Defendants*                         :    JANUARY 2, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants move for summary judgment as to the above-captioned case. As shown below, the defendants are entitled to judgment as a matter of law because plaintiff's allegations of race discrimination and disparate treatment fail to state a cause of action. Similarly, plaintiff's Due Process and Equal Protection claims are unfounded. For the reasons more fully discussed below, the defendants' Motion for Summary Judgment should be granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment is a favored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather .... must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate..., prior to trial, that the claims and defenses have no factual basis." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (emphasis added.)

A moving party is entitled to summary judgment if there is no genuine issue or dispute as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 322; Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995); Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995). Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary disposition

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

As the Supreme Court has emphasized, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Thus factual disputes that are irrelevant or unnecessary to the resolution of the legal issues shall be disregarded in a motion for summary judgment. Anderson, 477 U.S. at 248. A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Larkin, 891 F. Supp. at 723-24. A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." Id.

To defeat the motion, the nonmoving party must show more than that "some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996). "A party may not 'rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment.'" McCloskey v. Union Carbide Corp., 815 F. Supp. 78, 81 (D.Conn. 1993) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12, (2d. Cir. 1986) cert.

denied, 480 U.S. 932 (1987).  "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars would necessitate a trial in all Title VII cases." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).  Moreover, "summary judgment must be entered against 'a party who fails ... to establish the existence of an element essential to [its] case, and on which it will bear the burden of proof at trial,'" Larkin, 891 F. Supp. at 723, aff'd without opinion, 101 F.3d 109 (2d Cir. 1996), quoting Celotex, 477 U.S. at 322.

## FACTUAL BACKGROUND

The plaintiff, Herbert Mitchell, is a former employee of the state Department of Veterans Affairs (hereinafter the "DVA") in Rocky Hill, Connecticut. Despite a lack of credentials and experience for a position at the DVA, he was hired in November 2001 as Social Services Trainee to provide veteran and advocacy services. After the successful completion of a two-year training period, Mitchell would have been promoted to the position of Veteran Services Officer ("VSO"). (Facts, ¶¶ 3-6).

Mitchell was a capable trainee for the VSO position, but was a difficult employee to supervise. He displayed a distain for supervision and would argue with his direct supervisor, Maurice Collin. When an issue arose that Mitchell did not understand, instead of finding out the facts, he would go off half cocked or misinformed. He would accuse his supervisor of disciplining him when no such action had been contemplated or initiated. (Facts, ¶¶ 7, 9-21).

In May 2002,  Mitchell's supervisor instructed him to correct an error in a weekly itinerary he had submitted along with paperwork for Medicaid reimbursement funds that come to the agency through the work of the VSOs.  Mitchell did so. Again in June 2002, Maurice Collin

again noticed an error on Mitchell's weekly itinerary and directed him, via a June 21, 2002

memo, to correct the matter and to pay more attention to this detail. Mitchell claims that he had

already prepared and submitted a correct form. But instead of communicating this information to

Collin, Mitchell went to Collin's supervisor, Deputy Commissioner Tasi Vriga, to complain

about Collin. When Collin was summoned by Vriga to discuss the memo, Mitchell became

angry, disrespectful and insubordinate towards Collin. Subsequently, Mitchell followed Collin to

his office and continued his verbal abuse towards Collin. Collin told Mitchell to leave the office.

Feeling threatened, Collin put his right hand on Mitchell's shoulder as he guided him through

the door as Mitchell was backing out of the doorway. Collin then closed the door. At no time did

Collin push Mitchell as he claims. (Facts, ¶¶ 22-43). Being angry, Mitchell went down to the

security office and requested that the police be called so he could file an assault charge against

Collin. Two employees witnessed the altercation and neither saw Collin assault or deliberately

push Mitchell. (Facts, ¶¶ 22-43).

The Rocky Hill police were called. The police took statements from all the parties and the

witnesses. Both Mitchell and Collin pressed charges against the other. The information was

submitted to the State's Attorney, who declined to prosecute either person. (Facts, ¶¶ 44-48).

The Director of Security, Hugo Adams, also investigated the incident based on a

complaint by Mitchell that he had been subjected to workplace violence. The internal DVA

investigation was conducted pursuant to the DVA workplace violence policy. The results of the

investigation did not substantiate an assault against Mitchell. (Facts, ¶¶ 73-74).

In July 2002, based on Mitchell's behavior and attitude towards his supervisor, the DVA

decided to terminate Mitchell during what the Human Resources department thought was his

probationary working test period. However, within a week of Mitchell being let go, his

4

termination was formally rescinded when it was learned that Mitchell's working test period had passed and he was entitled to a pre-determination Loudermill hearing. On July 23, 2002, a Loudermill hearing was held during which the plaintiff was present and represented by his union steward. Later that day, the decision to terminate Mitchell was upheld and he was so notified. Mitchell grieved his termination through the collective bargaining process. (Facts, ¶¶ 49-54).

Through the grievance process, a voluntarily stipulated agreement was reached in which the DVA agreed to reinstate Mitchell with all back pay and benefits, in return for Mitchell's acknowledgment that he would act respectfully towards co-workers and supervisors. Mitchell was reinstated on October 4, 2002 to his former position and received all back wages and benefits. (Facts, ¶¶ 55-56).

In late 2002, the state budget crisis required the layoff of some 2,800 unionized state employees, which included DVA employees. A committee of DVA officials was set up by the Commissioner to decide how best to make the necessary budget cuts. The committee did not include Maurcie Collin, Tasi Vriga, Christopher Dunn or Eugene Miligaro, Jr. All of the DVA departments were scheduled to lose some personnel. Over Maurice Collin's objection, some of the layoffs affected the veteran services unit staff. Two VSO positions were eliminated. The union contract covering the VSO positions required that layoffs occur by seniority. Herbert Mitchell, and another male VSO employee with the least seniority in that unit under the union contract, were laid off in January 2003. None of the defendants had any involvement in the actual decisions about which positions would be eliminated. (Facts, ¶¶ 58-69).

## PLAINTIFF CANNOT PROVE A CLAIM UNDER § 1983 FOR FIRST AMENDMENT RETALIATION BY THE DEFENDANTS.

The Plaintiff alleges that the defendants, Collin, Dunn, Vriga and Miligaro, retaliated against him for his alleged exercise of free speech arising from a work related interpersonal dispute that occurred on June 21, 2002. The retaliatory conduct the plaintiff complains about consists of the plaintiff first being terminated, in July 2002, then reinstated in October 2002 and finally being laid off in January 2003.

The actual "protected speech" the plaintiff identifies as the basis of his retaliation claim includes: (1) his decision to file a complaint with the local police alleging an assault by his supervisor on June 21, 2002; and (2) the filing of an internal workplace violence claim that maintains was never investigated. (Facts, ¶ 76).

In order for a public employee to make out a claim that he has been subjected to discipline in retaliation for First Amendment activity, he must demonstrate "that: (1) his speech was constitutionally protected [by the First Amendment], (2) he suffered an adverse employment decision, and (3) a casual connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994).

### 1.    Plaintiff's Alleged Speech Does Not Address Matters of Public Concern.

As stated by the Supreme Court:

[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick v. Myers, 461 U.S. at 138, 147 (1983).

As the Supreme Court has repeatedly emphasized, not every bureaucratic complaint is a matter of public concern:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark -- and certainly every criticism directed at a public official-- would plant the seed of a constitutional case. . . . The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

Connick, 461 U.S. at 149. Thus, employee grievances about employment policies or working conditions do not constitute matters of public concern. Luck v. Mazzone, 52 F.3d 475 (2d Cir. 1995); Ezekwo v. NYC Health & Hospitals Corporation, 940 F.2d 775 (2d Cir.), cert. denied, 502 U.S. 1013 (1991). Even grievances accusing an employer of illegal activity are not matters of public concern if the employee's motivation is personal. See, e.g. Ezekwo, 940 F.2d at 781 (plaintiff's complaints of sex and race discrimination were not matters of public concern because plaintiff's "primary aim was to protect her own reputation and individual development as a doctor"); Saulpaugh v. Monroe, 4 F.3d 134, 143 (2d Cir. 1993), cert. denied, 510 U.S. 1164 (1994)(employee's allegations of sexual harassment did not state a First Amendment claim because they were "personal in nature and generally related to her own situation"); Knowlton v. Greenwood Indep. School Dist ., 957 F.2d 1172, 1178 (5th Cir. 1992)(cafeteria workers' complaints about serving meals at board meetings without pay, although relating to violations of the Fair Labor Standards Act, addressed "private, not public concerns").

In addition to content, the court must consider the form and context of an employee's speech. **In general, speech that is made on the job, is not addressed to a public audience, or is delivered in the course of an employee's official duties is not speech on a matter of public**

**concern**. For example, in <u>Volberg v. Pataki</u>, 917 F. Supp. 909 (N.D.N.Y.), <u>aff'd</u>, 112 F.3d 507 (2d Cir. 1996), the court held that the general counsel of the New York Department of Environmental Conservation was not speaking on a matter of public concern when she sent a memo to her supervisors, cautioning them that attorney layoffs in the agency would have a disparate impact on minority attorneys, because the employee was stating her views in her capacity as general counsel. According to the court, "the First Amendment does not, under ordinary circumstances, protect an at-will high-level policy-making employee from being fired because of job-related opinions and ideas [she] expresses as part of [her] employment." <u>Id</u>. 917 F. Supp. at 916.

Similarly, in <u>Koch v. City of Hutchinson</u>, 847 F.2d 1436 (10th Cir.), <u>cert</u>. <u>denied</u>, 488 U.S. 909 (1988), the court held that a fire marshal's official report, giving his professional opinion that arson was the cause of a house fire, was not speech on a matter of public concern, even though it conflicted with the opinion of the county attorney, because the speech was delivered in the course of the fire marshal's official duties. <u>See also</u> <u>Hom v. Squire</u>, 81 F.3d 969, 974 (10th Cir. 1996)(concluding that plaintiff's allegations concerning a motor vehicle agency's illegal bidding practices were "matters of internal departmental affairs and personal interest," not matters of public concern); <u>Mitchell v. Coffey County Hospital</u>, 903 F. Supp. 1415 (D. Kan. 1995)(holding that a maintenance supervisor's telephone call to the State Fire Marshal's office reporting his safety concerns about the installation of a fan during hospital construction, was not a matter of public concern because it was made in the course of the employee's duties and was not intended to inform the public of anything, but rather to seek guidance in the performance of his job); <u>Gomez v. Texas Department of Mental Health</u>, 794 F.2d 1018 (5th Cir. 1986)(concluding that a statement by an employee of a state treatment facility for the mentally

ill, to an employee of a similar county center, that the length of patient stays at the state center was going to be reduced was not of public concern, in part because it took place in the context of a routine employee meeting); Thomson v. Scheid, 977 F.2d 1017 (6th Cir. 1992), cert. denied, 508 U.S. 910 (1993)(investigator's allegations of grand jury cover-up was not a matter of public concern).

In the present case, the plaintiff's decision to report an alleged assault by a co-worker does not rise to the level of protected speech on a matter of public concern.[1] When Herbert Mitchell asked the DVA security office to call the Rocky Hill police, he was acting as an employee on a matter of purely personal interest. His allegation against a co-worker does not implicate the DVA on a matter of general public concern.

In his deposition, Mitchell admitted that his alleged protected speech forming the basis of his First Amendment claim was simply his request that security call the Rocky Hill police department and a workplace violence claim that was not addressed by the state. He testified as follows:

> Q:    So your claim really is in this case that you were laid off because you went to Rocky Hill police
>       department and filed a complaint, that they retaliated against you and laid you off. The
>       Commissioner did?
>
> A:    No, I am saying that they first fired me, and then reinstated me.
>
> Q:    And the--
>
> A:    And then the layoff came and it was a way, Hey we can get rid of him.

(Facts, ¶ 76).

*      *      *

---

[1]    The plaintiff reported that he was pushed several times by his supervisor, defendant Collin, during a verbal altercation after he was asked to leave Mr. Collin's office and he refused. The police investigation did not produce sufficient evidence to sustain a prosecution on Mitchell's claim of an assault or Collin's counter action for threatening behavior. (Facts, ¶ 48).

Q:    And you're claiming that they got rid of you in retaliation of that in violation of your First Amendment rights?

A:    Yes.

Q:    Are you claiming any other exercise of your right to First Amendment speech?

A:    Yes, workplace violence issue was not addressed by the State of Connecticut.

(Facts, ¶ 76).

Mitchell further admits, contrary to his allegations, his workplace violence claim was internally investigated by DVA and only pertained to the June 21, 2002 incident between himself and Maurice Collin. (Facts, ¶ 75). At no time did Mitchell report any systemic improprieties about the DVA. Mitchell's entire case arises from an isolated personal work related dispute with his supervisor that extended no further than his own personal interest. Regarding his incident with Collin , his supervisor, Mitchell testified:

Q:    Any my understanding is that the altercation that you had with Mr. Collin on or about June 21st of 2002, that occurred on the Department of Veteran Affairs' building. Where you worked? Correct?

A:    Yes.

Q:    And it pertained to an employment-related issue, the letter that you received, telling you to correct the report, is that correct?

A:    Yes.

Q:    It involved yourself -- And Mr. Collin was your immediate supervisor?

A:    Yes.

Q:    And then Mr. Vriga was the deputy?

A:    The deputy commissioner who--

Q:    Oversaw that area?

A:    His responsibility was VSO.

Q:    Okay, oversaw VSO. And so that altercation pertained to your employment. Correct?

A:     Yes, sir.

Q:     Or your employment situation?

A:     Yes.

Q:     And it would be a fair statement that your altercation between you and Mr. Collin, what happened,

pertain to you also, personally. In other words, it affected your personally?

A:     Yes it most personally did.

(Facts , ¶¶ 57, 77).

Any interpretation of the above facts as implicating a matter of public concern where

none exists would turn every inter-personal conflict within an agency into a First Amendment

claim, which the United States Supreme Court has been careful to reject.

## 2.     The Plaintiff's Speech Was Not A Motivating Factor In His Termination or Subsequent Layoff.

Even "if the employee succeeds in demonstrating that his speech is constitutionally

protected . . . he must then prove that the speech was a substantial or motivating factor in the

adverse employment action." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir.), cert. denied, 120 S.

Ct. 70 (1999); see also Lowe v. Amerigas, Inc., 52 F. Supp. 2d 349 (D. Conn. 1999), aff'd, 208

F.3d 203 (2d Cir. 2000) (requiring plaintiff bringing claim under Conn. Gen. Stat. §31-51q to

prove that speech was a motivating factor in adverse employment action); D'Angelo v.

McGoldrick, 239 Conn. 356, 685 A.2d 319 (1996). "The causal connection must be sufficient to

warrant the inference that . . . the adverse employment action would not have been taken absent

the employee's protected speech." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). In the

absence of any such causal connection, the employee's claim must fail. See Blum v. Schlegel, 18

F.3d 1005, 1013-14 (2d Cir. 1994); Velasquez v. Goldwater Memorial Hospital, 88 F. Supp. 2d

257 (S.D.N.Y. 2000).

In this case, the plaintiff essentially contends that he was terminated, then reinstated, and then laid off in January 2003 because of his allegations about defendant Collin's behavior.  Any inference of causation is destroyed for several critical reasons.

First, there is no evidence to corroborate the plaintiff's claim of an assault or to establish a pretext for retaliation. All of the witnesses to the June 21, 2002 incident between the plaintiff and Collin refute Mitchell's version of events. (Facts, ¶ 46).  The plaintiff admits that when he received Collin's June 21, 2002 memorandum directing him to correct his weekly itinerary, instead of simply providing Collin with a copy of the corrected itinerary that Mitchell claims was already completed, instead he went up to Tasi Vriga's office to complain.  Mitchell had been warned earlier on May 2002 about the importance of completing the forms correctly. (Facts, ¶¶ 24-31). Rather, Mitchell became angry and belligerent towards Collin in Tasi Vriga's presence. Despite an admonishment to calm down, Mitchell followed Collin from Vriga's office and continued to argue with Collin. His verbal abuse towards his supervisor is a legitimate non-retaliatory reason for the decision to terminate Mitchell. (Facts, ¶¶ 31-36).

Second, the stipulated agreement between Mitchell and the DVA further substantiates the legitimate nonretaliatory reason for the discipline imposed upon Mitchell for his insubordinate behavior towards his supervisor. The stipulated agreement to reinstate Mitchell expressly acknowledges that Mitchell needed to improve his treatment towards both co-workers and supervisors. That agreement reads in part:

"In signing that Agreement the Grievant acknowledges it is his intent to be a good employee while being respectful to co-workers and supervisors."

(Facts, ¶ 55).  There was no reason for Mitchell to confront his supervisor and provoke an altercation simply because he had been directed to correct his weekly itinerary, which Mitchell

acknowledges his supervisor had a right to do. Mitchell's own behavior provides a legitimate non-retaliatory and non-pretextual reason for the discipline imposed.

Third, the plaintiff now contends that after having been reinstated with full back pay and benefits, his layoff in January 2003 was also a retaliatory act. He testified that he overheard Commissioner Migliaro tell a DVA trustee that he was upset with the plaintiff because he called the Rocky Hill police. But, irrespective of Migliaro's personal feelings, the plaintiff cannot refute several critical facts that destroy any inference of retaliatory animus pertaining to his 2003 lay off.

1. The Union contract covering the plaintiff's position required that layoffs be done by seniority;

2. The plaintiff was the least senior VSO employee in the Veterans Advocacy and Services Unit;

3. The plaintiff was one of two VSO employees laid off;

4. The defendants were not involved with the DVA Committee decisions regarding layoff in 2003.

(Facts, ¶¶s 59-69).

There is amble evidence supporting that agency's decision to discipline the plaintiff for his insubordinate and disrespectful conduct, culminating in the June 21, 2002 incident. Furthermore, there is evidence that plaintiff's subsequent lay off in 2003 was not premised upon any protected speech.

**THE PLAINTIFF CANNOT PROVE ANY PERSONAL INVOLVEMENT ON THE PART OF DEFENDANTS IN THE DECISION TO LAY OFF THE PLAINTIFF AS PART OF STATE-WIDE BUDGET CUTS IN 2003.**

Under § 1983, a defendant's "personal involvement" in an alleged deprivation of constitutional rights is a prerequisite to an award of damages. See, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987); Alfara Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987). A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983, when he or she has directly participated in the infraction. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)(emphasis added). A plaintiff must thus allege a tangible connection between the acts of the defendant and the injuries suffered. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).

The defendants remind the court that the plaintiff must prove a constitutional violation against each individual defendant. The State of Connecticut Department of Veteran Affairs is not a defendant. Accordingly, the burden is upon the plaintiff to show how each defendant was personally involved in a constitutional violation sufficient to impose liability.

Defendant Christopher Dunn did not supervise the plaintiff, did not witness the incident of June 21, 2002, and was not involved in the plaintiff termination or lay off. (Facts, ¶ 73). So his inclusion in this lawsuit is frivolous. Furthermore, there is no evidence that Maurice Collin had the authority or made the actual decision to terminate the plaintiff in July 2002. (Facts, ¶ 64).

Similarly, the plaintiff concedes that he was terminated in July 2002 and subsequently reinstated in October 2002 with all back pay and benefits due to him. (Facts, ¶¶ 55-56). So the only tangible loss he claims relates to his layoff in January 2003. The un-refuted facts show that a DVA committee was set up to determine how to effectuate the budget cuts and what positions

would be eliminated from each DVA department. Over the objection of Collin, the Veteran Services Unit had to cut several employees, including two VSO positions. Mitchell's position was eliminated along with another VSO employer who had more seniority than him. More importantly, Mitchell, to refute the defendants legitimate non-retaliatory reason (seniority), he must prove that absent his speech he would have necessary retained his position. He will have no evidence to prove this fact, much less show that the union bumping rights or more senior DVA employees would not have bumped him from his position given his minimal seniority. (Facts, ¶¶ 59-69).

Robert Norman, one of the committee members testifies by affidavit that none of the defendants, including Commissioner Migliaro, had any direct involvement in the decision about which positions would be eliminated. Ironically, Maurice Collin actually argued to retain Mitchell and the other VSO employee. (Facts, ¶¶ 60-64). The most telling testimony on this issue came from Mitchell himself when he was asked if he had any evidence that any of the defendant were involved in the decision to lay him off in 2003. He testified:

> Q:    Okay. Is it your testimony that the decision to lay you off was the Commissioner's
>        decision?
>
> A:    As far as I know yes.
>
> Q:    Do you know if any of the defendants had any input in who got laid off?
>
> A:    I don't know.

(Facts, ¶ 64).

So, how the plaintiff can assert that defendants Collin, Vriga, Miligaro or Dunn[2] were personally involved in the decision to lay off the plaintiff in 2003 is a mystery.

---

[2]  Defendant Dunn was a Security Supervisor. His sole involvement in the case is the allegation in paragraph 14 of the Amended Complaint that Dunn had an official report on the June 21, 2002 incident concealed. In fact, the report was never concealed and is attached to Dunn's affidavit, Ex.18. Defendant Dunn did not supervise or have any contact with the plaintiff.

## PLAINTIFF CANNOT PROVE A CASE FOR VIOLATION OF HIS PROCEDURAL OR SUBSTANTIVE DUE PROCESS RIGHTS

### 1.    Procedural Due Process

The basis of the plaintiff's due process claim is not clear. When asked at his deposition to explain the nature and basis of these claims he stated:

Q:    You are claiming that you were denied procedural due process. Do you know what that term means?

A:    I presume that --

Q:    Don't presume anything. Tell me if you know what it means?

A:    Exactly, no.

Q:    All right. You claim here that you were denied substantive due process. Do you know what that term means.

A:    No.

Similarly, the plaintiff does not allege facts clearly stating the basis of his due process claims. Nevertheless, the plaintiff cannot prove a claim under either theory and these claims were must likely added to the complaint with little or no thought.

A public employee dismissible for cause is entitled to a very limited hearing prior to her termination, to be followed by a more comprehensive post-termination hearing. Cleveland Board of Ed. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 89 L. Ed. 2d 494 (1985). The Loudermill hearing "should be an initial check against mistaken decisions -- essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. Id. at 545-596. The predetermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his or her side of the story. Id. at 546. Notice and hearing is

not required, so long as there is the availability of a prompt post-termination opportunity to be heard. See Gilbert v. Homar, 138 L. Ed. 2d 120 (1997); Hunt v. Prior, 236 Conn. 421, 439, 673 A. 2d 521 (1996).

In the present case, the plaintiff was placed on paid leave pending a formal pre-determination hearing on July 23, 2002. By letter of July 17, 2002, the plaintiff was given notice of a Loudermill hearing, his right to union representation, the nature of the contemplated discipline, and his right to offer reason why the contemplated discipline should not be imposed. (Facts, ¶¶ 50-51). The Plaintiff attended the July 23, 2002 hearing along with his union representative, who actually handled the matter for him. (Facts, ¶ 52).

Furthermore, after the Loudermill hearing, the plaintiff grieved his termination through the union contract and was re-instated on October 2, 2002 pursuant to a stipulated agreement. So the plaintiff was afforded all of the required procedural due process rights and has no constitutional claim. (Facts, ¶ 55).

## 2.    Substantive Due Process.

The Due Process Clause of the Fourteenth Amendment provides "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State." The substantive component of the Clause "protects individual liberty against 'certain governmental actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, Texas, 503 U.S. 115, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992), quoting Daniels v. Williams, 474 U.S. 327, 331 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986). The United States Supreme Court has interpreted the Fourteenth Amendment's substantive due process component to forbid the government from infringing "certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 113 S. Ct. 1439, 1447, 123 L. Ed. 2d 1 (1993). A state violates due process when its action " 'afford[s] those canons of

decency and fairness which express the notions of justice of English-speaking peoples' . . . [and are] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Rochin v. California, 342 U.S. 165, 169, 72 S. Ct. 205, 208, 86 L. Ed. 183 (1952) (quoting Malinski v. New York, 324 U.S. 401, 416-17, 65 S. Ct. 781, 789, 88 L. Ed. 1029 (1945) (opinion of Frankfurter, J.) and Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S. Ct. 330, 332, 78 L. Ed. 674 (1934).   "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, e.g., Rochin, supra, it serves to protect governmental power from being 'used for purposes of oppression.' " Daniels v. Williams, 474, U.S. at 331, 106 S. Ct. at 665.

The Supreme Court has consistently expressed great reluctance "to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended . . . the doctrine of judicial restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins v. City of Harker Heights, Texas, 112 S. Ct. at 1068.  The Court must therefore "focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake and what the [government] allegedly did to deprive her [ ] of that right." Id.

The plaintiff's complaint does not specifically identify any fundamental right upon which a substantive due process claim is brought.  Nor do the allegations in the complaint allege any governmental action which the Court has previously recognized as violating substantive due process guarantees.   There is nothing in the plaintiff's allegations against any one of the defendants that even remotely suggests governmental action taken with the intent to deprive him of life, liberty or property or for the purpose of oppression, as required to state a valid substantive due process claim.   The only tie between the facts of this case and anything governmental in nature is the fact that the parties are state employees.  Indeed, the Supreme Court in Collins, supra, specifically declined to extend the protections of substantive due process to claims arising from an employment relationship, holding that:

Because the Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society," Daniels v. Williams, 474 U.S. at 332, 106 S. Ct., at 665, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law, see, e.g., id., at 332-333, 106 S. Ct., at 665-666; Baker v. McCollan, 443 U.S. 137, 146, 99 S. Ct. 2689, 1695, 61 L. Ed. 2d 433 (1979); Paul v. Davis, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160, 47 L. Ed. 2d 405 (1976). The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship. See, e.g., Bishop v. Wood, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d 684 (1976); Board of Regents of State Colleges v. Roth, 2709-2710, 33 L. Ed. 2d 548 (1972)

Again, in the present case the plaintiff does not allege facts showing a violation of substantive due process. It cannot be emphasized enough that through the contractual grievance process the plaintiff was re-instated to his former position with full back pay and benefits in October 2002. The procedures in place to assure that a public employee has due process before they are permanently deprived of a constitutionally protected interest were not violated in this case. The plaintiff's substantive due process claim is even more specious than his meritless procedural due process claim.

### PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS ARE SUBJECT TO DISMISSAL ON THE GROUNDS OF QUALIFIED IMMUNITY.

If the Court finds that the plaintiff cannot produce sufficient evidence to show a violation under § 1983, the qualified immunity issue need not be reached. However, even if the Court should find that plaintiff's § 1983 claims are sufficient to withstand summary judgment, then the defendants, Collin, Vriga, Dunn, and Migliaro are entitled to the protection of qualified immunity and summary judgment must enter in their favor.

19

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2829 (1985); Giacolone v. Abrams, 850 F.2d 79, 84 (2d Cir. 1988). "The entitlement is an immunity from suit rather than a mere defense to liability . . ." Id. The principal purpose of the doctrine is to enable public officials to do their jobs without fear of subsequently facing liability for actions they could not reasonably have believed violated the law at the time. Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982), and to avoid disruption to effective government counsel by the burdens of litigation. Mitchell v. Forsyth, 105 S. Ct. at 2809. The doctrine of qualified immunity seeks to ensure that conscientious public officials will feel free to discharge their duties unflinchingly and without diversion, that able citizens are not deterred from accepting public office, and that needless expense can be avoided. Harlow, 102 S. Ct. at 2736. The test is one of objective reasonableness, and is determined by establishing whether a reasonable official in the defendant's position could have believed that his actions were lawful, in light of clearly established law. Anderson v. Creighton, 483 U.S. 635,107 S. Ct. 3034, 3039 (1987).

The test is a stringent one and requires that there be a very close factual fit between the case under consideration and previous case law establishing the illegality of the action or conduct at issue in order for the law to be characterized as "clearly established." Thus, in determining whether a particular right was clearly established, the Court must first identify the claimed right in a manner suited to the facts and circumstances of the particular case. Anderson, 107 S. Ct. at 3039; Soares v. State of Conn., 8 F.3d 917 (2d Cir. 1993). Then it must examine the case law of the Supreme Court and of the Circuit to determine whether, during the time period in question, the law was so clearly established that a reasonable official would understand that his actions were unlawful. Although the precise action in question need not have been held unlawful to

defeat a claim of qualified immunity, the unlawfulness must be apparent under preexisting law. Anderson, 107 S. Ct. at 3039.

The Court must also decide whether it was clear at the time of the alleged violations of law that an exception did not permit the actions in question. Gittens v. LeFeure, 891 F.2d 38, 42 (2d Cir. 1989). Finally, and perhaps most importantly, even if the court concludes that the law was clearly established, the Court must determine whether it was objectively reasonable for the official to believe that his actions did not violate those rights. Oliveira v. Mayer, 23 F.3d 642, 648-49 (2d Cir. 1994). The subjective motivation of the officials is irrelevant to the inquiry. Anderson, 107 S. Ct. at 3040; Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). Rather, the focus is on whether reasonable officials in the position of the defendants could have believed their actions were lawful. Where reasonable officials could disagree, the official is entitled to qualified immunity. Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir. 1993).

The Second Circuit has held that where the underlying § 1983 claim requires a showing of intent, as in a claim of unconstitutional retaliation, a government official's motive or intent in carrying out the questioned conduct should be considered in the qualified immunity analysis. Musso v. Hourigan, 836 F.2d 736, 742 (2d Cir. 1988) ("Harlow does not require us, as appellants would have it, to ignore the fact that intent is an element of the relevant cause of action." Id. at 743). See also Sheppard v. Beerman, 94 F.3d 823, 828-29 (2d Cir. 1996); and Blue v. Koren, 72 F.3d 1075, 1083 n.5. (2d Cir. 1995).

When the defense of qualified immunity is raised to a § 1983 claim that is grounded in a state actor's unconstitutional motive as here, the federal district courts and Courts of Appeal have been placed in a quandary. "The 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where . . . the 'clearly established

law' itself contains a subjective component." Blue v. Koren, 72 F.3d at 1083.  These courts,

including the Second Circuit, recognize that permitting consideration of motive could eviscerate

the protection to which government officials are entitled by qualified immunity.  In response,

these courts have required that a plaintiff present proof of the unconstitutional motive of each

defendant, and have imposed on plaintiffs a "heightened standard," requiring plaintiffs to provide

particularized evidence of a direct or circumstantial nature that demonstrates the required state of

mind in order to avoid summary judgment on the defense of qualified immunity.[3]  Blue v.

Koren, 72 F.3d at 1084.  ("[T]he plaintiff must proffer particularized evidence of direct or

circumstantial facts as suggested in Justice Kennedy's concurrence in Siegert v. Gilley,  500 U.S.

226, 111 S.Ct. 1789, 1795 (1991) supporting the claim of an improper motive in order to avoid

summary judgment.")  Particularized evidence of improper motive include expressions by the

state officials regarding their state of mind, circumstances suggesting in a substantial fashion that

the plaintiff has been singled out, or the highly unusual nature of the actions taken.  Blue v.

Koren, 72 F.3d at 1084.

---

[3] The "heightened standard" required by the Second Circuit is different from the "heightened standard" that the D.C. Circuit imposed on plaintiffs in Crawford-El v. Britton, 93 F.3d 813 (D.C. Cir. 1997), which the Supreme Court held was improper. Crawford-El v. Britton, supra, 118 S. Ct. 1584 (1998).  In Crawford-El, the D.C. Circuit required a prisoner to adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment on the ground of qualified immunity. Thus, requiring the plaintiff to meet a heightened burden of proof.

The heightened standard "required by the Second Circuit requires the plaintiff to offer specific evidence of unconstitutional motive which "we [the Second Circuit] are doubtful that it imposes a burden greater than is already required under Fed. R. Civ. P. 56…[We] confess considerable doubt as to whether the heightened standard is really heightened or is simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment." Blue, supra, 1083-84.  The Second Circuit's approach was impliedly approved by the Supreme Court in Crawford-El, supra.

"[F]irm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims."  Id. at 1596, quoting Harlow v. Fitzgerald, supra, 102 S. Ct. at 2739, fn. 35).

In <u>Blue v. Koren</u>, the Second Circuit articulated that the following framework should be used when a motion for summary judgment is based upon the ground of qualified official immunity:

> [T]he first issue is whether a clearly established right is at stake. See <u>Siegert</u>, 111 S.Ct. at 1793. If it is the court must then address whether the conduct was objectively reasonable. If not, the motion must be denied. If the conduct was objectively reasonable, a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment. The reasonableness of the conduct is itself substantial evidence in support of the motion and requires in response to a particularized proffer of evidence of unconstitutional motive.

<u>Id</u>. at 1084.

While it may be clearly established that Herbert Mitchell has a right under the First Amendment to be free of retaliation for exercising his right to free speech, it is equally clear that the DVA had the right to discipline the plaintiff for inappropriate conduct irrespective of the plaintiff's alleged protected speech. Under these circumstances, the defendants' conduct was objectively reasonable. The plaintiff will offer no credible evidence to suggest that under the circumstances described above their decision to terminate plaintiff, reinstate him, and subsequently lay him off violated clearly established law. This is especially so in light of the same circumstance (layoff) was given to another employee with more seniority than the plaintiff (Facts, ¶ 59-69).

## CONCLUSION

For all of the above stated reasons the plaintiff cannot produce sufficient evidence to state a prima facie case. Accordingly, the defendants are entitled to summary judgment as a matter of law.

DEFENDANTS

RICHARD BLUMENTHAL
ATTORNEY GENERAL

By: _____

Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

I hereby certify that pursuant to §5(b) of the Federal Rules of Civil Procedure, a copy of

the foregoing Memorandum of Law in Support of their Motion for Summary Judgment was sent

via first class mail, postage prepaid, this 2nd day of January, 2004, to:

John R. Williams, Esq.
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

_____

Joseph A. Jordano
Assistant Attorney General