UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
Jan 2, 04
2003 DEC 33 A 10: 12
DISTRICT COURT
HARTFORD CT

HERBERT L. MITCHELL,      :   CIVIL ACTION NO.
    *Plaintiff*                  :   3:02CV2136(AVC)

V.                        :

MAURICE COLLIN, TASI VRIGA,  :
EUGENE A. MIGLIARO, JR.,     :
CHRISTOPHER DUNN,            :

    *Defendants*             :   JANUARY 2, 2004

## DEFENDANTS' RULE 56(a)(1) STATEMENT OF FACTS

1.    The plaintiff, Herbert Mitchell is a resident of the state of Connecticut. (Answer to Amended Complaint, ¶ 3).

2.    The defendants Maurice Collin, Tasi Vriga, and Christopher Dunn are residents of the state of Connecticut. (Exhibits 15, 16, and 18, Affidavits of Maurice Collin, Tasi Vriga and Christopher Dunn).

3.    At all times material to this action Maurice Collin, Tasi Vriga and Chirstopher Dunn were employed by the State of Connecticut Department of Veteran Affairs in Rocky Hill, Connecticut (Ex. 15, ¶¶ 1, 3; Ex. 16, ¶¶ 1, 3, Exhibit 18, ¶¶ 1, 3).

4.    In October 2001, Herbert Mitchell was hired as a Social Services Trainee at the DVA. The state job description for that position requires a minimum of five years of social services experience. After the successful completion of a two-year training period, the plaintiff would be promoted to the position of Veterans Services Officer ("VSO"). (Exhibit 1; Ex. 15, ¶¶ 4, 6; Exhibit 17, Affidavit of Robert Norman, ¶¶ 5-7;

1

Exhibit 19, Excerpts from Deposition of Herbert Mitchell, dated November 26, 2003 (hereinafter "Mitchell Depo."), pp. 5:25-26:16).

5. Herbert Mitchell had no social services experience and was not qualified for the position of social services trainee. He was hired by the Commissioner as a favor to a DVA trustee who had worked with Mitchell at Pratt & Whitney prior to being laid off. (Ex. 15, ¶ 4-5; Ex. 16, ¶ 6; Ex. 17, ¶ 5).

6. Upon his hiring, Mitchell was informed of the two-year training period and the requirements for completing the training period. (Ex. 1; Ex. 15, ¶ 6; Ex. 16, ¶ 7).

7. At the time the plaintiff was hired and throughout his employment with DVA, Maurice Collin supervised the Veterans Advocacy and Services Unit and was Herb Mitchell's immediate supervisor. (Ex. 15, ¶ 7, Ex. 16, ¶ 8).

8. At the time the plaintiff was hired and throughout his employment with DVA, Tasi Vriga was the Deputy Commissioner of the DVA and was Maurice Collin's immediate supervisor. (Ex. 16, ¶¶ 3-4).

9. Despite his lack of training, Herb Mitchell would often display an attitude of distain for supervision or direction especially, when he wanted to do things his own way. (Ex. 15, ¶ 7; Ex. 16, ¶¶ 8-9).

10. Herbert Mitchell also would say and do things that were disruptive or confrontational toward co-workers or his supervisor based on incorrect or insufficient information. (Ex. 15, ¶¶ 8-15; Ex. 16, ¶¶ 9-14).

11. In May 2002, a verbal confrontation occurred between two DVA employees in the Advocacy and Services unit. The incident did not involve Herbert Mitchell. (Ex. 15, ¶ 9; Ex. 16, ¶ 10).

12. The next day, on May 10, 2002, Maurice Collin authored a memo to all of the District #1 personnel advising them of a change in office procedures. The purpose of the memorandum was to assure a sense of civility and professionalism in the District #1 office where the verbal confrontation had occurred. (Exhibit 2, Letter dated May 10, 2002 from Collin to District 1 Personnel; Ex. 15, ¶ 11; Ex. 16, ¶ 11).

13. The memo of May 10, 2002 reminded employees of the workplace violence policy regarding state employees and that if a verbal or physical altercation did occur in the future, those involved would be subject to discipline. The memo was not directed at any particular employee. (Ex. 2; Ex. 15, ¶ 11; Ex. 16, ¶ 12).

14. Each employee was asked to acknowledge receipt of the May 10, 2002 memo. (Ex. 2; Ex. 15, ¶ 12; Ex. 16, ¶ 13).

15. Herb Mitchell refused to sign the memo. Instead, he sent the memo back to Maurice Collin with a notation directing him to obtain signed union approval of the changes because Mitchell considered the statement about potential discipline if work rules were violated to be a form of discipline. (Ex. 15, ¶. 16, ¶ 14).

16. Mitchell disrupted the office over the issue of the security memorandum despite the fact that the memo was not discipline under the union contract, he was not being disciplined in any way, and he just did not know what he was talking about. (Ex. 15, ¶ 13; (Ex. 19, pp. 59:14-68).

17. Maurice Collin informed Mitchell that he could file a union grievance if he so desired, which he declined to do. (Ex. 15, ¶ 13; Ex. 19, pp. 77:9-78:12).

18. On another occasion, a veteran came to the DVA unit near closing time. Mitchell stayed late to counsel the veteran. (Ex. 15, ¶ 14).

3

19.     The next day, Maurice Collin reminded Mitchell that DVA policy did not permit overtime and for liability reasons he should not be in the office alone after hours with a client. Collin advised Mitchell in the future to ask the person to come back during working hours. (Ex. 15, ¶ 14).

20.     Mitchell argued with Collin about the policy and stated "I'm not asking for overtime" and interpreted the situation as criticism of him, rather than job related information. (Ex. 15, ¶ 14).

21.     On yet another occasion, Maurice Collin was visiting a DVA regional satellite office and observed that Mitchell did not take a lunch break. He reminded Mitchell of the state policy that he had to take a lunch break whether he decided to eat. Mitchell again took offense and interpreted Collin's comment to be a criticism of him. (Ex. 15, ¶ 15).

22.     As part of his job, usually every other day, Mitchell was required to visit nursing homes in a geographical region seeking out and counseling veterans about benefits due them. (Ex. 15, ¶ 16; Ex. 16, ¶ 15; Ex. 19, Mitchell Depo., pp. 7:21-10:22).

23.     It was an essential part of the VSO job that each employee maintain an accurate daily itinerary. Certain work time at the nursing homes is reimbursed by Medicaid and therefore, the Medicaid reimbursement forms have to match the stated itinerary in the event there is an audit. (Ex. 15, ¶ 16; Ex. 16, ¶ 15; Ex. 19, Mitchell Depo., pp. 11:22-14:16).

24.     In May 2002, Collin noticed that Mitchell's Medicaid reimbursement forms were not consistent with the weekly itinerary he submitted. (Exhibit 3, Memo

4

dated May 14, 2002 from Collin to Mitchell; Ex. 15, ¶ 17; Ex. 19, Mitchell Depo., pp. 16:1-25).

25. On May 14, 2003, Collin sent a memo to Mitchell pointing out the error and directing him to correct his itinerary, which he did. (Ex. 3; Ex. 15, ¶ 18; Ex. 19, Mitchell Depo., pp. 16:1-17:6).

26. On June 21, 2002, Collin again noticed the same type of discrepancy between Mitchell's daily itinerary and Medicaid reimbursement sheets for the week of May 17, 2002. (Ex. 15, ¶ 19).

27. Mitchell understood the importance of filling out accurate weekly itinerary and Medicaid reimbursement forms. (Ex. 19, Mitchell Depo., pp. 18:3-24:13).

28. Collin authored a second memo to Mitchell about the discrepancy and instructed him correct the error by the close of business on June 24, 2002. (Exhibit 4, Memo dated June 21, 2002 from Collin to Mitchell; Ex. 15, ¶ 19; Ex. 19, pp. 25:8-26:8).

29. Mitchell agrees that Collin had authority to direct Mitchell to correct his report. (Ex. 19, p. 31:7-10).

30. Mitchell claims that her had a corrected copy of the itinerary already completed, but did not provide it to Collin or bring it with him to Deputy Commissioner Tasi Vriga's office. (Ex. 19, pp. 26:25-27:25, 32:5-23). Mitchell could have sent the corrected itinerary to Collin through interoffice mail, but choose not to. (Ex. 19, pp. 43:1-44:11).

31. On June 21, 2002 at approximately 11:00 a.m., Mitchell took Collin's memo and went up to the office of Tasi Vriga, the Deputy Commissioner. (Ex. 15, ¶ 20; Ex. 16, ¶ 17).

5

32. Vriga asked Collin to step into his office because Mitchell was there speaking about the June 21, 2002 memo. (Ex. 15, ¶ 20; Ex. 16, ¶ 18).

33. Upon Collin's arrival at Deputy Vriga's office, Mitchell became angry and in a hostile voice began shaking the memo at Collin stating that Collin was "harassing him by sending him three different memos and that he could not do that without the union being present there to represent him." (Ex. 15, ¶ 21, Ex. 16, ¶¶ 18-20).

34. Collin instructed Mitchell that the matter of his corrected itinerary was not open to discussion and that if he did not comply with the memo he would be disciplined. Collin then left Deputy Director Vriga's office. (Ex. 15, ¶ 22; Ex. 16, ¶ 21).

35. Mitchell subsequently followed Collin down the hall towards Collin's office, followed by Deputy Commissioner Vriga. (Ex. 15, ¶ 23; Ex. 16, ¶¶ 22-23).

36. In a threatening manner Mitchell began yelling at Collin about letting him do his job. (Ex. 15, ¶¶ 23-24).

37. Fearful of Mitchell's tone, Collin instructed Mitchell to do his job and to leave his office. (Ex. 15, ¶¶ 23-24; Ex. 16, ¶ 24).

38. Despite repeated directives to leave his office, Mitchell refused stating: "I've got mud on you and I'll get you." (Ex. 15, ¶ 25).

39. Feeling threatened, as Mitchell moved toward the open door, Collin put his right hand on Mitchell's right shoulder and guided him back about six inches so he could close the door. (Ex. 15, ¶ 26; Ex. 16, ¶ 24).

40. At no time did Collin push Mitchell or assault him in any way. (Ex. 15, ¶ 26; Ex. 16, ¶ 25).

41. After the incident, Collin was upset and anxious about being threatened by Mitchell, so he left the premises to seek medical assistance. (Ex. 15, ¶ 27).

42. After the June 21, 2002 incident, Mitchell left Collin's office and went down to the DVA Security Office. (Ex. 16, ¶ 26).

41. Vriga followed Mitchell down to the security office. There, Vriga spoke to Mitchell privately about his request that security call the police. He asked Herb Mitchell if he was sure he wanted to do that. (Ex. 16, ¶ 26).

43. Mitchell broke down crying saying "I am going to lose my job." (Ex. 16, ¶ 26).

44. Mitchell told Vriga that he wanted to file a formal complaint against Maurice Collin for assault. He then went ahead and did so. (Ex. 16, ¶ 27).

45. Vriga left the building because he learned that his mother had suffered a stroke and he needed to go to the hospital. (Ex. 16, ¶ 27).

46. The Rocky Hill police investigated the incident and took a statement from all of the participants and witnesses. All of the witnesses denied seeing Collin assault the plaintiff. (Ex. 5, Ex. 6, Ex. 15, ¶ 28; Ex. 16, ¶ 28).

47. The Rocky Hill police investigated the matter. They took statements from all the witnesses. (Ex. 6; Ex. 19, pp. 41:5-20).

48. Both Collin and Mitchell pressed charges against each other, but prosecution was declined by the state attorney's office for lack of evidence. (Exhibit 6, Report from Rocky Hill Police Department, dated June 24, 2002); Ex. 19, Mitchell Depo., pp. 41:11-42:4).

7

49. On July 11, 2002, the agency made the decision that Mitchell's overall behavior on June 21, 2002 warranted that he be terminate during what the Human Resources Department believed was his working test period. Mitchell was given a letter dated July 11, 2002 to this effect. (Ex. 15, ¶ 29; Ex. 16, ¶ 29).

50. Subsequently in consultation with the union, it was discovered that the plaintiff's working test period had passed, and therefore, as a permanent employee formal administrative proceedings would have to be followed (i.e. a Loudermill hearing, etc.) before any disciplinary action could occur. Accordingly, on July 17, 2002, the plaintiff's termination was rescinded and a hearing was scheduled for July 23, 2002 pursuant to the Collective Bargaining Agreement. (Exhibit 8, Letter dated July 17, 2002 from Vriga to Mitchell; Ex. 15, ¶ 30; Ex. 16, ¶ 30).

51. In the July 17, 2002 letter, the plaintiff was placed on paid administrative leave. He was informed of the Loudermill hearing, his right to union representation, the contemplated disciplined that might be imposed and his right to present reasons why the contemplated discipline should not be imposed. (Exhibit 8, Letter dated July 17, 2002 from Vriga to Mitchell; Ex. 15, ¶ 30; Ex. 16, ¶ 30).

52. On July 23, 2002, a Loudermill hearing was held to discuss Mitchell's behavior on June 21, 2002. The plaintiff was present with union representation. (Ex. 15, ¶ 31, Ex. 16, ¶ 31; Ex. 19, p. 89:4-25).

53. Later on July 23, 2002, the decision was made to terminate Mitchell from his trainee position at DVA because of his behavior toward his supervisor and his uncooperative attitude. A letter was delivered to him on that date informing him of the

decision to terminate his employment. (Exhibit 9, Letter dated July 23, 2002 from Vriga to Mitchell; Ex. 15, ¶ 32, Ex. 16, ¶ 32).

54.     Mitchell's union steward was Steve Kowalski. (Ex. 19, Mitchell Depo., p. 145:2-16).

55.     Mitchell grieved his termination of July 23, 2002. Through that grievance process, a voluntary stipulated agreement was worked out that reinstated Mitchell in return for his acknowledgement that he would be respectful towards co-workers and supervisors. Mitchell voluntarily executed the stipulated agreement. (Exhibit 10, Stipulated Agreement dated Oct. 11, 2002; Ex. 15, ¶ 33; Ex. 16, ¶ 33).

56.     Herb Mitchell returned to work in October 2002, with retroactive wages, benefits and service time from July 23, 2002. (Ex. 15, ¶ 34; Ex. 16, ¶ 34; Ex. 19, pp. 100:17-101:1, 105:14-107:6).

57.     Mitchell's speech about the incident of June 21, 2002 and dealt entirely with his personal employment situation at DVA. (Ex. 15, ¶ 35; Ex. 16, ¶ 35).

58.     Mitchell, when he was reinstated, was given all of the same job responsibilities, privileges, and duties he formerly performed as a VSO trainee. (Ex. 15, ¶ 36, Ex. 16, ¶ 36).

59.     In late 2002, the state budget crisis required the layoff of 2,800 unionized state employees, which included DVA employees. (Ex. 15, ¶ 37, Ex. 16, ¶ 37; Exhibit 17, Affidavit of Robert Norman, ¶ 7).

60.     A committee of DVA officials was established to decide how best to make the necessary budget cuts, while maintaining basic services. The committee did not

include defendants Maurice Collin, Tasi Vriga, Christopher Dunn or Eugene Migliaro, Jr. (Ex. 17, ¶¶ 9, 11, 14; Ex. 15, ¶ 38).

61. As a department head, Collin was summoned to a meeting of the DVA officials who were charged with deciding how the agency would comply with the budget cuts. (Ex. 15, ¶ 38; Ex. 16, ¶ 37, Ex. 17, ¶ 10).

62. At that meeting, Collin argued to retain all the employees in the Veteran Services Unit because it was a department that actually brought revenue into the agency. (Ex. 15, ¶ 38, Ex. 16, ¶ 37; Ex. 17, ¶ 10).

63. Collin was informed that all departments were going to lose some personnel. (Ex. 15, ¶ 40; Ex. 17, ¶ 10).

64. Maurice Collin, Tasi Vriga, Eugene Migliaro and Christopher Dunn were not involved in the decision about which employees would be laid off. (Ex. 15, ¶ 41; Ex. 16, ¶¶ 38, 42; Ex. 17, ¶¶ 11, 14; Ex. 18, ¶ 7-9; Ex. 19, p. 144:4-9).

65. The union contract covering VSO employees, including Herbert Mitchell, required that layoffs occur in each class by SENIORITY. (Exhibit 14, Contract between the State of Connecticut and AFSCME for period July 1, 1999 to June 30, 2002; Ex. 15, ¶ 41; Ex. 16, ¶ 38; Ex. 17, ¶ 11).

66. The DVA Human Resources Department provided information about the seniority and bumping rights of each employee. (Ex. 15, ¶ 42; Ex. 16, ¶ 39; Ex. 17, ¶ 12).

67. Herbert Mitchell had the least seniority of the VSO trainees. He was one of two VSO employees who were laid off based on seniority. (Exhibit 12, DVA Seniority List as of July 1, 2002 for layoff purposes; Ex. 15, ¶ 43, Ex. 16, ¶ 40; Ex. 17, ¶ 12).

68. The other VSO employee had more seniority than Mitchell. Also, the union contract provided bumping rights for more senior employees. (Exhibits. 12 and 14).

69. Whatever the Commissioner thought of the plaintiff's decision to call the Rocky Hill police department on June 21, 2002, it did not have a bearing on the committee's decision regarding the budget cuts in 2003. (Ex. 17, ¶ 15).

70. Herb Mitchell has no actual evidence of a conspiracy to give false statements. (Ex. 15, ¶ 44, Ex. 16, ¶ 41).

71. On June 21, 2002, the plaintiff spoke with Building and Grounds officer Brian Toolan, who filed a report about the June 21, 2002 incident as reported to him by the plaintiff. Toolan did not witness the June 21, 2002 incident between Mitchell and Collin. (Exhibit 18, Affidavit of Christopher Dunn, ¶¶ 5-6; Ex. 19, pp. 47:17-23).

72. Officer Toolan's report contained confidential medical information that had to be removed from the report. Officer Toolan was ordered to remove the medical information and resubmit his report otherwise unchanged, which he did. (Ex. 18, ¶¶ 1-6).

73. Defendant Dunn did not supervise Herbert Mitchell, nor did he witness or investigate the June 21, 2002 incident or have any involvement in the decision to lay off DVA employees. (Ex. 18, ¶¶ 1-8).

74. The DVA has a workplace violence policy consistent with the Governor's Executive order. The agency investigates all workplace violence claims internally and reports the results to the Department of Public Works. (Ex. 18, ¶ 16).

75. In 2002, a full investigation was conducted of the June 21, 2002 incident involving Herbert Mitchell and Maurice Collin. The agency's investigation did not substantiate an assault. (Exhibit 5, Statement dated August 14, 2002 by Hugo Adams; Ex. 17, ¶¶ 7-8; Ex 19, p. 151:14-152:11).

76. Mitchell claim of retaliatory conduct involves his termination in July 2002, his reinstatement in October 2002 and his lay off in January 2003. (Ex. 19, Mitchell Depo., p. 105:1-19, pp. 143:17-144:3).

77. Mitchell's entire claim of First Amendment retaliation is premised on his interpersonal work related conflict with Maurice Collin on June 21, 2002. (Ex. 19, Mitchell Depo., pp. 110:2-111:5).

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersigned does hereby certify that on the 2nd day of January, 2004, a true and accurate copy of the forgoing Rule 56(a)(1) Statement of Facts was sent by First Class United States mail, postage prepaid, to the following:

John R. Williams, Esq.
Williams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Joseph A. Jordano
Assistant Attorney General