UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HERBERT L. MITCHELL | : | |
| | : | |
| VS. | : | NO. 3:02CV2136(AVC) |
| | : | |
| MAURICE L. COLLIN, | : | |
| TASI VRIGA, | : | |
| EUGENE A. MIGLIARO, JR. | : | |
| and CHRISTOPHER DUNN | : | JANUARY 19, 2004 |

### BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Judge Kravitz recently observed in an interview with the CBA Federal

Practice Section Newsletter that defense counsel in virtually 100% of pending

employment cases in this court have been filing motions for summary judgment,

seemingly without regard for the facts of their individual cases or the well-

established Second Circuit law placing a very low burden on plaintiffs defending

against such motions.  See Kravitz, J., in *Federal Practice Section Newsletter*,

Conn. Bar Assn., Winter, 2004, p. 5.  He did not use the word "frivolous" in his

interview, but the word springs to mind when reviewing the motion now before this

court.

This is an action based upon the retaliatory discharge of the plaintiff from

state employment after, and because, he had filed a criminal complaint against his

1

supervisor for physically assaulting him in the workplace.  The plaintiff asserts First
Amendment retaliation, as well as procedural and substantive due process claims
under the Fourteenth Amendment.[1]  In their summary judgment motion, the
defendants claim that the plaintiff's contentions are false, that defendant Collin did
not assault him, that he was a troublemaker, and that he was fired because he could
not perform.  In an attempt to support these allegations, the defendants have
submitted "cut-and-paste" excerpts from the plaintiff's sworn deposition.  They have
omitted all of the parts in which the plaintiff swears from personal knowledge to the
truth of his allegations -- including the part where the defendant Migliaro, who was
the Commissioner of Veterans Affairs who headed the plaintiff's department,
admitted that the plaintiff was fired because of his complaint to the police.  Rule
3.3(a)(1) of the Rules of Professional Conduct provides that "a lawyer shall not
knowingly make a false statement of material fact or law to a tribunal...."  While
defense counsel has every right to believe his client's version of the facts, and a
duty to argue it to the court, he has no right to represent as he necessarily does in

---

[1]

In the opening paragraph of their brief, the defendants unaccountably state that
this action alleges "race discrimination and disparate treatment...[and] due
process and equal protection claims...."  Apparently defense counsel did not feel
his motion was important enough to avoid using a brief he apparently had written
for a Title VII case.

his motion that there are no material facts in dispute, when he has - and has withheld from the court – precisely those material facts that are in dispute.

"The standards governing summary judgment are well-settled.  Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits..., show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  Fed. R. Civ. P. 56(c); *see also* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant....Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 285-86 (2d Cir. 2002).

When the moving party "'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140-41 (2nd Cir. 2003), *quoting* <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158, 160 (1970).  "[T]he moving party bears the ultimate burden

of establishing its right to summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 982 (10th Cir. 2003).

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party.  So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied.  In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution.  R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997).  "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.'  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is

improper.'" <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1535 (2d Cir. 1997).  Citing <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

"[T]he Second Circuit has cautioned that, in cases where motive, intent or state of mind are at issue, summary judgment should be used sparingly."  <u>Ruscoe v. Housing Authority of City of New Britain</u>, 259 F. Supp. 2d 160, 166 (D. Conn. 2003) (Nevas, J.), <i>citing</i> <u>Dister v. Continental Group, Inc.</u>, 859 F.2 1108, 1114 (2nd Cir. 1988).[2]

The applicable evidence of the plaintiff in this case is contained primarily in the pages of his sworn deposition testimony omitted from the defendants' filings and attached as an exhibit to the plaintiff's Local Rule 56 Statement, and secondarily in some of the documents submitted by the defendants themselves.  The plaintiff's evidence shows the following:

• The plaintiff did not raise his voice at any time during the meeting he had with defendants Collin and Vriga.  He stated to Collin that he would have no choice but to file a grievance, whereupon Collin began yelling: "Get the hell out of my

---

[2]

A "trial court must be especially cautious in deciding whether to grant [summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination."  <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2nd Cir. 1999).  "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2nd Cir. 1997).

office!" to which the plaintiff responded that he was speaking not to Collin but to Vriga.  (Plaintiff's deposition transcript, p. 39)

- At that point, Collin again yelled: "Get the hell out of my office!" and came up to the plaintiff and shoved the plaintiff three times.  The plaintiff opened the door and Collin shoved him out.  The plaintiff went upstairs and called security.  (Ibid.)

- Both Vriga and Patty Matulis saw Collin shove the plaintiff.  (Id. p. 40)

- Collin, Vriga and Matulis all have lied about the incident.  (Ibid.)

- The only time the plaintiff yelled was to say to Collin: "Get your hands off me!"  (Id. p. 45)

- Plaintiff absolutely never made the statement, "I's got mud on you and I'll get you."  (Ibid.)

- A security guard heard Vriga trying to talk the plaintiff out of filing a police or security report on the incident, stating that "Moe Collin was a good guy.  He has a...psychiatric problem – and he was under medicine...."  (Ibid.)

- This conversation between the plaintiff and Vriga was overheard by security guard Brian Toolan, who wrote it up.  Chris Dunn, Toolan's supervisor, deleted it out of the computer and changed the entries in the logbook to conceal the fact. (Id. pp. 45, 48-49, 133-34)

- Toolan still works for the department.  (Id. p. 86)

7

- Somebody called the Rocky Hill police to report Collin's assault upon the plaintiff.  (Id. p. 50)

- Knowing that the police were on the way, Collin, Vriga and Matulis all immediately left the property.  (Id. pp. 50-51)

- Collin went to the Newington VA hospital for emergency psychiatric help. (Id. p. 51)

- A Rocky Hill police officer called Vriga and toldl him he would be arrested for interference unless he immediately returned.  (Ibid.)

- After the incident, defendant Collin stated to defendant Vriga: "Am I going to lose my job?  Am I going to get arrested?"  (Id. p. 52)

- The plaintiff did not threaten Collin.  (Ibid.)

- Prior to this incident, Collin had stated to the plaintiff that the plaintiff was working very hard and very diligently and that he was impressed with the plaintiff's knowledge, demeanor and his relationship with the people.  He said to the plaintiff: "You know, you're one of the best people that I've had.  You've become the fastest and the quickest."  (Id. p. 55)

- The plaintiff took the initiative to arrange for the Secretary of the Department of Veterans Affairs to present to a 102-year-old female veteran of World War I a medal she had earned during the war but had never received.  (Id. pp. 15, 56)

8

- Collin hated the filing of union grievances and said to the union steward that he felt that anybody who filed a grievance was by virtue of doing so calling him stupid.  (Id. p. 57)

- After the plaintiff had made his complaint to the Rocky Hill police, defendant Vriga ordered him to be in his office in the early afternoon.  As the plaintiff was walking to that office with his union steward, they observed Collin walking out of the facility.  There were three security guards present and defendant Vriga.  Vriga handed a piece of paper to the union steward and to the plaintiff and said: "Read it." It said that the plaintiff was terminated for inability and unwillingness to perform the job.  The plaintiff pointed out that they had been telling him that he was doing a great job and had said that publicly on several occasions at the monthly VSO meetings.  (Id. p. 83)

- On November 24, 2003, the plaintiff – who is a veteran – went to the Veterans Home at Rocky Hill and there he was told that he was not allowed access to the property.  The security guard did not know the reason, but the order came from the Commissioner's office.  (Id. p. 86)

- On one occasion prior to Collin's assault of the plaintiff, Collin had taken the plaintiff and others to lunch in Rocky Hill.  They were there for an hour, but their lunch period is only half an hour.  When the plaintiff filled out his time card, he put

down half an hour personal time.  When he submitted that card and turned it in, Collin "went bananas."  (Id. p. 101)

- There was a customer that came to the door one day about five minutes before closing time.  The veteran had come from his job and the plaintiff spent a half hour with him.  The following day, the plaintiff told Collin about it and Collin yelled and screamed and "went off."  Collin said: "There is no overtime."  The plaintiff said: "I know that there's no overtime.  I have been working overtime and you've been well aware of that.  I've been coming in on holidays and I don't charge for the overtime."  Collin "went ballistic" about it.  (Id. p. 102)

- When the plaintiff's termination was reversed and set aside by the State Labor Board, and he was ordered returned to his job with back pay, the plaintiff was told that he was supposed to be given his keys, his passes, and that everything was supposed to be as it had been before.  But defendant Collin held back all of these things and did not let the plaintiff have his passes and keys or access to the computers until just before he was laid off in 2003.  (Id. pp. 104-06)

- Defendant Vriga submitted a false report to the Rocky Hill police and changed his story several times.  The police had to have him come back numerous times because his stories just didn't gel.  (Id. p. 132)

10

● The plaintiff's layoff in 2003 was further retribution for his having complained about workplace violence. The claim that he was laid off for budgetary reasons was false. (Id. pp. 138-40)

● There were positions available that the plaintiff could and should have been given, even if his position was being eliminated, but that did not happen. (Id. p. 140)

● Defendant Migliaro specifically stated to Sam Ranno, a member of the Board of Trustees of the VA hospital, that the reason the plaintiff was fired and the reason he was laid off was because the plaintiff had called the police on defendant Collin. (Id. pp. 141-43)

● The decision to lay the plaintiff off in 2003 was made by defendant Migliaro. (Id. p. 144)

● Defendant Collin encouraged the falsification of records, especially when doing so would take money from the federal government. He instructed the plaintiff that, if he walked the five-minute walk from his office to the VA hospital, he must bill the federal government for half an hour of his time. (Id. pp. 13-14)

● The workplace violence policy of the DVA specifically stated: "If there are any confrontations, verbal or otherwise, all parties involved will face disciplinary action." (Id. p. 60)

11

- On June 27, 2002, following the assault, the plaintiff filed a written complaint with the head of security at the DVA.  In his complaint, he specifically asserted that defendants Collin and Vriga had violated the "State of Connecticut Hands Off or No Touch Rule" and asked for punitive action against both. (Defendants' Exhibit 5)

- The plaintiff filed a sworn, written criminal complaint against defendant Collin with the Rocky Hill Police Department on the afternoon of June 21, 2002. (Defendants' Exhibit 6)

- Defendant Vriga terminated the plaintiff on July 11, 2002, without any notice, opportunity to be heard or hearing, for the stated reason that "you have demonstrated an inability or unwillingness to perform your duties so as merit [sic] continuation."  (Defendants' Exhibit 7)

- On July 17, 2002, defendant Vriga rescinded his termination of July 11 but ordered the plaintiff to report for a hearing on July 23, 2002, and suspended him, with pay, until that date.  His stated reason for this action was "your failure to show a willingness or ability to perform so as to merit continuation.  Your recent behavior has shown an inability or unwillingness to display appropriate interpersonal skills with your co-workers and supervisor.  In recent events you and your co-worker have been unable to work cooperatively.  There has been contentious behavior surrounding issues of answering the telephone, parking personal vehicles, parking

12

and gassing up the state vehicle.  There have been numerous occasions when you have inappropriately challenged the directives of your supervisor and/or failed to follow the instructions you were given."  (Defendants' Exhibit 8)

●  On July 23, 2002, defendant Vriga handed the plaintiff a previously-written letter, dated July 23, 2002, which terminated his employment "effective with the close of business on July 27, 2002" "for your failure to show a willingness or ability to perform so as to merit continuation.  Your recent behavior has shown an inability or unwillingness to display appropriate interpersonal skills with your co-workers and supervisor....In recent events you and your co-worker have been unable to work cooperatively.  There has been contentious behavior surrounding issues of answering the telephone, parking personal vehicles, parking and gassing up the state vehicle.  There have been numerous occasions when you have inappropriately challenged the directives of your supervisor and/or failed to follow the instructions you were given....As a Social Services Trainee the minimum qualifications for eligibility included 'Interpersonal skills; oral and written communications skills; (and an) ability to follow oral and written instructions.'  These are the skills with which you should have entered state service and ones you should have been continuing to develop and hone during your time as a trainee.  You have not demonstrated skills and abilities in these areas at any level of proficiency specifically with regard to co-workers and supervisors."  (Defendants' Exhibit 9)

13

● The plaintiff was reinstated, as a result of a union grievance, effective October 4, 2002, with retroactive regular wages and benefits to July 27, 2002. (Defendants' Exhibit 10)

First, the procedural due process issue. The defendants profess not to understand this claim (Defendants' Brief at p. 16) but in fact they themselves admit the procedural due process violation. Their own exhibits demonstrate that they first terminated the plaintiff without affording him a *Loudermill* hearing and later had to back off that action and reinstate him. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).

The defendants admit that the plaintiff, because of his union membership, had a property interest in his state job. Once the property interest in the public position or benefit has been established, arbitrary deprivations are unlawful and actionable. Herz v. Degnan, 648 F.2d 201 (3d Cir. 1981); Winegar v. Des Moines Independent Community School Dist., 20 F.3d 895 (8th Cir. 1994); Palmer v. City of Monticello, 31 F.3d 1499 (10th Cir. 1994); Karan v. Adams, 807 F. Supp. 900 (D. Conn. 1992) (Cabranes, J.); Galvin v. Lloyd, 663 F. Supp. 1572 (D. Conn. 1987); Banerjee v. Roberts, 641 F. Supp. 1093 (D. Conn. 1986) (Cabranes, J.). See Burton v. Statewide Grievance Committee, 60 Conn. App. 698 (2000) (conducting a bar disciplinary hearing at a time the committee knew the lawyer was unavailable

14

because of her trial commitments denied due process).  See generally <u>Tedesco v.</u> <u>O'Sullivan</u>, 420 F. Supp. 194 (D. Conn. 1976) (Newman, J.).

"To satisfy pretermination due process, a public employee is entitled to notice of the charges, an explanation of the evidence, and an opportunity to be heard....Generally, something less than a formal adversarial hearing is required ....Rather, the purpose of the pretermination hearing is to ensure that 'there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'  ...We have held that 'informal meetings with supervisors' are sufficient to satisfy the due process hearing require-ment....Moreover, we have rejected a discharged employee's argument that a university grievance procedure was constitutionally inadequate because it would not have granted her the opportunity to confront or cross examine witnesses at a post-termination hearing." <u>Flath v. Garrison Public School Dist. No. 51</u>, 82 F.3d 244, 247 (8th Cir.1996), citing <u>Loudermill</u>, <u>supra</u>.  It is not necessary that there be a delay between the notice and the opportunity to respond to it, so that entire process can be conducted constitutionally in a single meeting.  <u>Coleman v. Reed</u>, 147 F.3d 751, 754 (8th Cir. 1998).  "The Due Process Clause requires that individuals have an opportunity to be hear 'at a meaningful time and in a meaningful manner' regarding the deprivation of life, liberty, or property.  <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976).  Governmental employers must recognize their employees' property interest

in continued employment.  *Id.*  To respect this interest, a public employer must provide certain pre-termination procedures before removing an employee.  These include (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his side of the story."  Wainscott v. Henry, 315 F.3d 844, 852 (7th Cir. 2003).

The Loudermill hearing, whatever its parameters, must be a real hearing and not merely a matter of "going through the motions."  "Due process requires that, prior to termination, an employee be given the chance to tell her side of the story, and that the agency be willing to listen.  Otherwise, the 'opportunity to respond' required by Loudermill is no opportunity at all."  Ryan v. Illinois Dept. of Children and Family Services, 185 F.3d 751, 762 (7th Cir. 1999).  "[F]undamentally biased process is not due process...."  Levenstein v. Salafsky, 164 F.3d 345, 352 (7th Cir. 1998).  "Due Process requires that a hearing 'must be a real one, not a sham or a pretense.'"  Ciechon v. City of Chicago, 686 F.2d 511, 517 (7th Cir. 1982), quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring).

In the present case, moreover, a jury could conclude from the evidence that the hearing which defendants did give the plaintiff after retracting their initial termination, did not meet *Loudermill* standards.  It is clear that the termination letter already had been written when the so-called hearing began.  There is no indication

in the defendants' evidence that the plaintiff was afforded any opportunity to respond and certainly the letter notifying him of the hearing did not accurately set forth the true basis on which termination was about to be undertaken.  But even if the second phase termination hearing did meet *Loudermill* standards, the plaintiff would have a cause of action for the procedural due process denial when he was terminated the first time.  The defendants do not appear to have addressed this issue in their brief.

Next, the substantive due process issue.  The evidence of the plaintiff establishes that defendant Collin, who was his supervisor, physically assaulted him at the workplace in the presence of Collin's own supervisor, defendant Vriga.  "A substantive due process claim...alleges not that the state's procedures are somehow deficient, but that the state's conduct is inherently impermissible, regardless of any protective or remedial procedures it provides....It is based on 'the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court.'" Ramos v. Gallo, 596 F. Supp. 833, 837 (D. Mass. 1984). Quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980).  *Cf*. Rochin v. California, 342 U.S. 165, 169 (1952) (Frankfurter, J.).   "The overarching objective of this doctrine is to prevent government officials from 'abusing [their] power, or employing it as an instrument of oppression.'" Conroe Creosoting Co. v. Montgomery County,

249 F.3d 337, 341 (5th Cir. 2001), quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).   A physical assault upon a public employee at his workplace, by his supervisors, certainly could be found by a jury to meet this test.

Turning to the First Amendment retaliation issue, the defendants make several claims.  First, they argue that the plaintiff's report of criminal wrongdoing to the police is not a matter of "public concern" as required for such an action.  That is wrong.  Discipline of a municipal employee for reporting possibly criminal wrongdoing in his agency to law enforcement officials almost always is actionable under Section 1983 as a First Amendment violation.  Dobosz v. Walsh, 892 F.2d 1135, 1141-42 (2d Cir. 1989); Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991); Robinson v. Balog, 160 F.3d 183 (4th Cir. 1998); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996); Gorman v. Robinson, 977 F.2d 350 (7th Cir. 1992); Hafley v. Lohman, 90 F.3d 264 (8th Cir. 1996); Cooper v. Smith, 89 F.3d 761 (11th Cir. 1996); Fikes v. City of Daphne, 79 F.3d 1079 (11th Cir. 1996).  In fact, such speech is protected even if the employee does no more than gripe about the illegalities to his peers, Chateaubriand v. Gaspard, 97 F.3d 1218 (9th Cir. 1996); or to his supervisors, Paradis v. Montrose Memorial Hospital, 157 F.3d 815 (10th Cir. 1998). "[O]ur inquiry focuses on the nature of the information, not its audience." Baldassare v. State of New Jersey, 250 F.3d 188, 197 (3rd Cir. 2001).  "The private

nature of the statement does not...vitiate the status of the statement as addressing a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 387 n. 11 (1987).

Although such complaints may be subject to a balancing test under Pickering v. Board of Education, 391 U.S. 563, 568 (1968), comparing the importance of this kind of free speech exercise to its potentially disruptive effect in the workplace, the importance of such speech is so great that the balance almost always must be struck in favor of its exercise, so that punishment for doing so is actionable. *E.g.,* Branton v. City of Dallas, 272 F.3d 730 (5th Cir. 2001) (police internal affairs officer entitled to sue for First Amendment violation for discipline imposed because she improperly had an *ex parte* communication with a police hearing officer in which she reported concerns that an officer had committed perjury at the hearing); Sexton v. Martin, 210 F.3d 905 (8th Cir. 2000); Prager v. LaFaver, 180 F.3d 1185 (10th Cir. 1999); Peterson v. City of Hartford, 80 F. Supp. 2d 21 (D. Conn. 1999) (Goettel, J.); Dillon v. Bailey, 45 F. Sup. 2d 167 (D. Conn. 1999) (Arterton, J.).  "The content of the employee's speech is an important consideration in determining the extent of the employer's burden to show likely disruption.  An employee's charge of unlawful conduct is given far greater weight than is a complaint as to the fairness of internal office operations." Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 140 (2d Cir. 1999).

Terminating an employee for reporting a theft from his own agency violated the employee's First Amendment rights.  Fox v. District of Columbia, 83 F.3d 1491 (D.C. Cir. 1996).  A deputy sheriff who claimed that his termination was retaliation for having investigated a fellow officer and having reported those findings to the state's attorney was entitled to a jury trial on his First Amendment retaliatory termination claim.  Lickiss v. Drexler, 141 F.3d 1220 (7th Cir. 1998).  A prison warden's public complaints about corruption and lack of security in the prison were protected speech, and the action of the Department of Correction in demoting and transferring him in retaliation justified the award of $168,000 in compensatory damages.  Campbell v. Arkansas Department of Correction, 155 F.3d 950 (8th Cir. 1998).  A detective demoted to patrolman and denied scheduled days off in retaliation for a letter of complaint to his chief that exculpatory information was being concealed in a murder investigation prevailed in his First Amendment suit against the chief and other responsible officials.  Dill v. City of Edmond, Oklahoma, 155 F.3d 1193 (10th Cir. 1998).  Complaints by an employee of a regional wastewater authority to the state environmental protection agency were clearly protected and the officials responsible for firing him in response were not entitled to qualified immunity for doing so.  Charvat v. Eastern Ohio Regional Wastewater Authority, 246 F.3d 607 (6th Cir. 2001).

A deputy sheriff's statement in the presence of a newspaper reporter, criti-

cizing the sheriff for requiring only African-American deputies to attend a meeting,

was held to be on a matter of public concern and thus protected speech.  Victor v.

McElveen, 150 F.3d 451 (5th Cir. 1998).  A police officer transferred from the elite

mounted patrol to a training officer in the police academy, in response to her filing of

a complaint with the EEOC about sexual harassment stated a valid claim for

retaliation for the exercise of protected speech in violation of the First Amendment.

Sharp v. City of Houston, 164 F.3d 923 (5th Cir. 1999).  See also Hall v. Missouri

Highway & Transportation Commission, 235 F.3d 1065, 1067 (8th Cir. 2000); Crain

v. Board of Police Commissioners, 920 F.2d 1402, 1411 (8th Cir. 1990).  "A

personal aspect contained within the motive of the speaker does not necessarily

remove the speech from the scope of public concern."  Greer v. Amesqua, 212 F.3d

358, 371 (7th Cir. 2000).  So a Transit Authority worker who publicly complained

about lack of safety protections on his job was held to have been speaking about

matters of such great public concern that the defendants' argument that these were

purely personal issues "borders on the frivolous."  Munafo v. Metropolitan Transp.

Authority, 285 F.3d 201, 211-12 (2nd Cir. 2002).  Even if the employee's speech is

predominantly concerned with personal matters, the presence therein of matters of

public concern will afford that speech First Amendment protection.  At most, a

Pickering-style balancing test might be employed to see just how much protection is appropriate. Finn v. New Mexico, 249 F.3d 1241 (10th Cir. 2001).

An assistant city administrator's statements to an alderman that rumors were circulating that the city administrator was having an extramarital affair with a city employee and that the city employee was receiving in return benefits to which she was not entitled, although arguably the basest sort of intra-office gossip, was held to be a matter of public concern protected by the First Amendment since public funds were involved. Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000). A fire department shift captain's vocal concern about the men downloading porn during their off hours likewise was held to be speech on a matter of public concern, and thus protected. Hufford v. McEnaney, 249 F.3d 1142 (9th Cir. 2001). A library supervisor's letter criticizing security at the library, circulated internally on a "need to know" basis, was protected by the First Amendment in a case which contains a lengthy analysis of many cases in this area. Kennedy v. Tangipahoa Parish Library Board of Control, 224 F.3d 349 (5th Cir. 2000). A health inspector's statement that an open-air market was being permitted to operate unlawfully was speech protected by the First Amendment. Myers v. Hasara, 226 F.3d 821 (7th Cir. 2000). A professor's complaints about a fellow professor's alleged plagiarism, abuse and harassment of students and staff, misuse of state funds and receipt of kickbacks was protected speech. Hulen v. Yates, 322 F.3d 1229 (10th Cir. 2003). Statements

by police officers to fellow officers and the president of the police union, expressing concern about a direct order of a supervisor suspending investigation into a shooting case, were constitutionally protected.  Gustafson v. Jones, 290 F.3d 985 (7th Cir. 2002).   Even a county employee's report that he had seen the county road superintendent and a department secretary having sex was held to be a matter of public concern and protected by the First Amendment.  Domina v. Van Pelt, 235 F.3d 1091 (8th Cir. 2000).

"[W]hen the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of 'public concern,' they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances -- which whether or not protected by the First Amendment are too remote from its central concerns to justify judicial interference with the employment relation, Connick v. Myers, 461 U.S. 138, 147 (1983) -- and casual chit-chat, which is not protected by the First Amendment at all.  Swank v. Smart, 898 F.2d 1247, 1251 (7th Cir. 1990)."  Dishnow v. School Dist. of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996) (Posner, C.J.).  Thus, the plaintiff in Brown v. Disciplinary Committee of Edgerton Volunteer Fire Dept., 97 F.3d 969 (7th Cir. 1996), engaged in protected free speech when he publicly criticized a decision to change the name

of the "Edgerton Fire Department" to "Edgerton Fire District."  And a public

employee fired because she reported an incident of sexual harassment had in so

complaining spoken on a matter of public concern.  Azzaro v. County of Allegheny,

110 F.3d 968 (3d Cir. 1997).

      The public complaint of a female employee about the governmental employe-

r's assertedly inadequate response to sexual harassment issues in the workplace is

on a matter of public concern and thus protected.  Schuler v. City of Boulder, 189

F.3d 1304, 1308 (10th Cir. 1999).  A highway department employee's memorandum

to his supervisor concerning traffic safety and snow removal at a particular intersec-

tion, although obviously related to the work of the agency, also was on a matter of

public concern and protected.  Lee v. Nicholl, 197 F.3d 1291 (10th Cir. 1999).

Complaints by an employee of a public agency "relating to...alleged

mismanagement of government funds and violations of [the agency's] bylaws...are

clearly matters of public concern."  Gorman-Bakos v. Cornell Cooperative Extension

of Schnectady County, 252 F.3d 545, 553 n. 4 (2nd Cir. 2001).  Cf., Vasbinder v.

Scott, 976 F.2d 118, 119-20 (2nd Cir. 1992); Keyser v. Sacramento City Unified Sch.

Dist., 238 F.3d 1132, 1137 (9th Cir. 2001); Johnson v. Multnomah County, 48 F.3d

420, 425 (9th Cir.), cert. denied, 515 U.S. 1161 (1995).

      "[P]laintiffs' interest in communicating ethnic pride as members of the NYPD

is not necessarily a matter only of private concern.  A statement is of public concern

if, in light of 'the content, form and context of [that] statement, as revealed by the whole record,' it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'...The parades in which plaintiffs seek to march...are themselves about ethnic pride and celebrating ethnic participation in the civic life of New York City." Latino Officers Association, New York, Inc. v. The City of New York, 196 F.3d 458, 466 (2d Cir. 1999). Citing Connick v. Myers, 461 U.S. 138, 146 (1983); Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999).

Defendants' second argument is that the plaintiff is unable, as a matter of law, to produce sufficient evidence to warrant a jury's belief that his complaint to the police was "a substantial or motivating factor" in his termination. This is an astonishing argument. According to the plaintiff, defendant Migliaro, who was the Commissioner of the DVA at the time, specifically stated that his complaint to the police was the reason for his termination. Moreover, there is a close connection in time. According to the plaintiff's testimony, he had received "rave reviews" from his superiors up until he was assaulted and complained to the police about it. Whereupon he was almost immediately fired. Temporal proximity is an important piece of evidence. Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.3d 545, 555 (2nd Cir. 2001) (pattern of retaliation beginning a few days after the end of the protected speech and concluding three months later); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2nd Cir. 1996) (twelve days);

Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 446-47 (2nd Cir.

1999) (retaliation one year after the filing of a protected lawsuit by the employee and

within one month of receiving deposition notices in that suit); Quinn v. Green Tree

Credit Corp., 159 F.3d 759, 769 (2nd Cir. 1998) (discharge less than two months

after protected act); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2nd Cir.

1980) (retaliation eight months after protected act).  Another important fact is proof

that the stated reason for the disciplinary action can be proven to be bogus, as in

this case and in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133

(2000).  The fact that the employee had an exemplary employment record prior to

the free speech exercise, as in this case, is another factor.  Hudson v. Norris, 227

F.3d 1047 (8th Cir. 2000).

The defendants focus this aspect of their argument on the plaintiff's layoff in

2003, after this suit was filed.  The factors noted above, coupled with defendant

Migliaro's express statement, establish a sufficient case for the plaintiff on that

issue.  But even if they did not, that would say nothing about the even stronger

cases which the plaintiff has concerning his two terminations in 2002.

The defendants also argue their lack of personal involvement in the actions

against the plaintiff.  Understandably, the defendants do not press this argument

respecting defendants Collin, Vriga and Migliaro, all of whom were personally and

critically involved in the first two terminations.  Defendant Migliaro claims to have

been personally involved in the third as well, and his claim has credibility because
he was the head of the agency.  Defendants assert, however, that defendant Dunn
was not in the plaintiff's "chain of command" and therefore is not responsible for
what was done to him.  Defendant Dunn's liability, however, stems from his knowing
involvement in the cover-up which preceded the terminations and paved the way for
them.  Thus, he is liable as a co-conspirator.    A civil conspiracy can be proved
entirely by circumstantial evidence, at least as easily as a criminal one.  Hampton v.
Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979); Hoffman-LaRoche, Inc. v. Greenberg,
447 F.2d 872, 875 (7th Cir. 1971); Mendocino Environmental Center v. Mendocino
County, 192 F.3d 1283 (9th Cir. 1999); Fisher v. Shamburg, 624 F.2d 156, 162
(10th Cir. 1980); Rutledge v. Electric Hose & Rubber, 327 F. Supp. 1267, 1273
(C.D. Calif. 1971); Lyle v. Teresi, 327 F. Supp. 683, 684 (D. Minn. 1971).

     "Though the common design is the essence of the charge, it is not necessary
to prove that the defendants came together and actually agreed, in terms, to have
that design, and to pursue it by common means.  If it is proved that the defendants
pursued by their acts the same object, often by the same means, one performing
one part and another part of the same, so as to complete it, with a view to the
attainment of the same object, the jury will be justified in the conclusion that they
were engaged in a conspiracy to effect that object."  Regina v. Murphy, 8 C. & P.

297, 310 (1837) (Coleridge, J.).  See Pierce v. United States, 252 U.S. 239, 250 (1919).

The leading case on Section 1983 conspiracies remains Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970).  The plaintiff in that case had participated in a sit-in demonstration to protest the segregation of a public library.  After the police chief told the group that the library had been closed, the group crossed the street to purchase lunch at the defendant's lunch counter.  The plaintiff alleged that a police officer entered the store and observed the integrated group sitting together.  Shortly thereafter, a waitress refused service.  Upon leaving the restaurant, the plaintiff was arrested on a false charge of vagrancy by the same officer who had observed her at the lunch counter.  In support of its summary judgment motion, the defendant presented affidavits of its manager and employees attesting that they had not seen or communicated with any police officer.  Reversing the order granting summary judgment, the Supreme Court (Harlan, J.) held that the mere presence of the officer was sufficient to permit an inference of conspiracy.  "If a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service."  398 U.S. at 155.  Conspiracies typically must be proven by inference from such concurrent conduct and proof in that manner is entirely sufficient.  Thus, the

fact that police officers investigating an automobile accident who permitted the wrongdoers to leave the scene during the investigation without submitting to alcohol testing, combined with their failure to conduct other basic on-site investigative procedures, permitted an inference of a conspiracy between the investigating officers and the drunken drivers to cover up the wrongdoing of the latter in violation of the victims' First Amendment right of access to the courts.  Delew v. Wagner, 143 F.3d 1219 (9th Cir. 1998).

Civil conspirators are liable for acts done in furtherance of some purpose of the conspiracy even if they are without knowledge of the specific acts. El Ramo, Inc. v. First National Bank of Nevada, 406 F.2d 1205 (9th Cir.), cert. denied, 396 U.S. 875 (1968).  Thus, evidence of a conspiracy between civilians and police offices to carry out unconstitutional activities will be sufficient to impose Section 1983 liability upon the civilians.  E.g., James v. Sadler, 909 F.2d 834 (5th Cir. 1990); Lewis v. Pearson Foundation, Inc., 908 F.2d 318 (8th Cir. 1990); State of New Mexico ex rel. Candelaria v. City of Albuquerque, 768 F.2d 1207 (10th Cir. 1985).


Finally, the defendants claim qualified immunity.  On this issue, they have the burden of proof.  Gomez v. Toledo, 446 U.S. 635, 640 (1980); Harlow v. Fitzgerald, 457 U.S. 800 at 815 (1982); Schechter v. Comptroller of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996); Black v. Coughlin, 76 F.3d 72, 75 (2d Cir. 1996);

Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994); DiMarco-Zappa v.

Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001); Buenrostro v. Collazo, 973 F.2d 39, 44

(1st Cir. 1992); Tatro v. Kervin, 41 F.3d 9 (1st Cir. 1994); Maul v. Constan, 928 F.2d

784 (7th Cir. 1991); Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992);

Benigni v. City of Hemet, 868 F.2d 307, 313 (9th Cir. 1988).

"A government official sued in his individual capacity is entitled to qualified

immunity (1) if the conduct attributed to him is not prohibited by federal law...; or (2)

where that conduct is so prohibited, if the plaintiff's right not to be subjected to such

conduct by the defendant was not clearly established at the time of the conduct...; or

(3) if the defendant's action was objectively legally reasonable in light of the legal

rules that were clearly established at the time it was taken."  O'Bert ex rel. Estate of

O'Bert v. Vargo, 331 F.3d 29, 36 (2nd Cir. 2003) (citations, quotation marks and

ellipses omitted).

The defendants apparently seek qualified immunity on the ground that their

hearts were pure, that they had no bad motives in what they did.  Citing Blue v.

Koren, 72 F.3d 1075 (2nd Cir. 1995).  But the defendants surrender when they

explain that it takes for a plaintiff to defeat a "good motive" qualified immunity

defense: "Particularized evidence of improper motive include [sic] expressions by

the state officials regarding their state of mind, circumstances suggesting in a

substantial fashion that the plaintiff has been singled out, or the highly unusual

nature of the actions taken."  (Defendants' Brief at p. 22)   As discussed above, the

evidence in this case is sufficient to establish all three.

The motion for summary judgment must be denied.


Respectfully submitted:


_____
JOHN R. WILLIAMS (ct00215)
51 Elm Street
New Haven, CT 06510
203/562-9931
FAX:  203/776-9494
E-Mail: jrw@johnrwilliams.com
Plaintiff's Attorney


CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Joseph A. Jordano, Esq.,
Assistant Attorney General, P. O. Box 120, Hartford, CT 06141-0120.


_____
JOHN R. WILLIAMS