Case 3:02-cv-02136-AVC     Document 21-2     Filed 01/21/2004     Page 1 of 15
Mitchell vs Collin, et al
11/26/2003                                                    Herbert L. Mitchell

Page 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT

2

3       _____
                                               )
4       HERBERT L. MITCHELL                     )
                                                )        Civil Action No.
5       VS.                                     )        302CV02136(AVC)
                                                )
6       MAURICE L. COLLIN, ET AL.               )
                                                )
        _____)

7

8               DEPOSITION OF: Herbert L. Mitchell
                DATE: November 26, 2003
9               HELD AT: Law Offices of the Attorney General
                          55 Elm Street
10                        Hartford, CT 06106
11      APPEARANCES:
12      WILLIAMS and PATTIS, LLC
                51 Elm Street, Ste 409
13              New Haven, CT 06510
                representing the Plaintiff.
14      BY:     KATRENA ENGSTROM, ESQUIRE
15      LAW OFFICES OF THE ATTORNEY GENERAL
                51 Elm Street
16              Hartford, CT 06106
                representing the Defendants.
17      BY:     JOSEPH JORDANO, ESQUIRE
18
19                      Reporter:  Aretha S. Martin, LSR
                         BRANDON SMITH REPORTING SERVICE
20                           44 Capitol Avenue
                        Hartford, Connecticut  06106
21                           (800) 852-4589
22
23
24
25

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

11/26/2003                                           Herbert L. Mitchell

Page 39

1          Q      Okay.  Moe Collin was talking to Patty, the

2    secretary?

3          A      I don't know what he was doing.

4          Q      What did you say to him?

5          A      I didn't say anything to him.   I was talking

6    to Tasi.

7          Q      Were you yelling?

8          A      No, I was not.   I was talking to Tasi.   I

9    said Tasi, Well, I will have no choice but to grieve it.

10   At the point, Moe Collin yelled, Get the hell out of my

11   office.   I turned to him and I said, I am talking to

12   Tasi.  I am not talking to you.

13         Q      All right.

14         A      I said Tasi -- Moe yelled again, Get the hell

15   out of my office.  He came up to me and shoved me three

16   times.  I am right up against the door.  I opened the door

17   and he shoved me out.  I went upstairs and I called

18   security.

19         Q      Okay.  So your testimony is you were shoved in

20   the hallway here outside   --

21         A      Not in the hallway.  It was right in front of

22   his desk.

23         Q      In front of the two desks?

24         A      Yes.  I was standing right there and Tasi is

25   standing there.  Patty is there and Tasi is right here

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 40

1    (indicating).

2         Q    So you're saying that Mr. Tasi and Ms. -- What

3    is her name?

4         A    Patty Matulis.

5         Q    They saw you get shoved?

6         A    They most certainly did as plain as day.  She

7    was looking straight at me and so was he.

8         Q    All right.  Are you aware in the case that

9    there is a different version of events from the different

10   people who were there?

11        A    Oh, I most certainly am, yes.

12        Q    And you've accused them of lying; is that

13   correct?

14        A    Yes.

15        Q    Would you agree that your version differs from

16   Moe Collin's version?

17        A    Yes.

18        Q    Would you agree that your version differs from

19   Mr. Tasi Vriga's version?

20        A    As far as I know, yes.

21        Q    I am talking about the issue of whether or not

22   Moe Collin pushed you three times?

23        A    Yes.

24        Q    And would you agree that your version differs

25   from Ms. Matulis?

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

11/26/2003                                              Herbert L. Mitchell

Page 45

1        A      I raised my voice when he put his hands on me

2    and then I yelled, Get your hands off me.

3        Q      Before that did you ever make a comment to the

4    effect of, "I've got mud on you.  And I'll get you"?

5        A      Absolutely no.  In that statement to Tasi,

6    there was a security guard that overheard Tasi trying to

7    talk me out of it stating that Moe Collin was a good guy.

8    He has a medical program -- actually he said psychiatric

9    problem -- and he was under medicine and what was I trying

10   to do.  And that particular guard, who I had asked to

11   write a statement to that effect, did write that

12   statement.   It was authorized by the chief of security.

13       Q      Which is who?

14       A      Hugo Adams.  Hugo Adams said to me, I can

15   have that statement in front of the steward, his

16   secretary, and the security officer.  The security officer

17   wrote it up.  I was told to pick it up at 3:00 that day.

18   I went in at 3:00 and I was told that, no, that I would

19   not be released.  If I wanted it, it would have to

20   subpoena it.  I was told by the security guard Brian

21   Toolan that his supervisor deleted it off of -- that his

22   supervisor, Chris Dunn, deleted it out of the computer,

23   which is the only one that he has access to in his

24   specific office, and that the logbook in the security

25   offices was changed.  And that when he wrote up his first

Mitchell vs Collin, et al

11/26/2003                                          Herbert L. Mitchell

Page 48

1    events that you told him.  Correct?

2           A    You have to restate that, no.    It would be

3    what he heard Tasi say to me.

4           Q    Let me back up.  Did you go down and report to

5    Mr. Toolan what had happened?

6           A    He took a statement from me.

7           Q    Okay.  So he took a statement from you about

8    what happened?

9           A    Yes.

10          Q    And then while you were there, you claim that

11   Mr. Tasi came in?

12          A    Yes.    And he put me in the office, but they

13   stood out in the hallway talking.

14          Q    And you claim that Mr. Toolan heard Mr. Tasi

15   try to talk you out of filing charges against Moe Collin?

16          A    Yes.

17          Q    And you believe that that would have appeared

18   in Mr. Toolan's report?

19          A    Yes.

20          Q    The conversation that he overheard?

21          A    Yes.

22          Q    And then the police officer was there also?

23          A    Yes, Officer Phelps.

24          Q    Okay.  So the information that you believe was

25   destroyed was Mr. Tasi allegedly trying to talk you out of

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                      Herbert L. Mitchell

Page 49

1    pressing charges against Mr. Collin?

2           A    Yes, that's correct.

3           Q    But with respect to any of the facts of what

4    happened in the office, these officers don't have any

5    information about that, do they?

6           A    No.

7           Q    Okay.

8           A    Brian Toolan had made a copy of the statement

9    that was deleted by his supervisor Chris Dunn.

10          Q    Do you have a copy of that statement?

11          A    I do not have a copy of that statement, but

12   Brian Toolan does.

13          Q    Did you ever obtain a copy of that statement?

14          A    No, I did not.

15          Q    Do you know Mr. Toolan's background?  What is

16   his position?

17          A    He's a security guard.

18          Q    Has he ever had any disciplinary problems with

19   the administration?

20          A    I do not know.

21          Q    Okay.  So the information that you believe is

22   missing, so that I am clear, is Mr. Tasi's statement about

23   trying to talk you out of pressing charges?

24          A    Yes.  And that's what I had asked and was told

25   that I could have it.  And then I was told that Chris

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                              Herbert L. Mitchell

Page 50

1    Dunn, because he had police background and had deleted it

2    -- because the only way that it could have been deleted is

3    on the computer where Brian supposedly works in the guard

4    shack.  Brian had E-mailed it to Dunn.   Dunn had it.   He

5    told him, No, and that if Mitchell wants it, he was going

6    to have to subpoena it.

7            Q    Did the security people call the Rocky Hill

8    Police for you?

9            A    I am not sure who called them.

10           Q    But you asked to call that the police --

11           A    I said, I would like the police involved based

12   upon what I see is going on in here.

13           Q    And to your knowledge, someone called?

14           A    Yes, they did.

15           Q    So they didn't stop you from calling the Rocky

16   Hill Police Department?

17           A    No.   But they said, Am I sure that I want to

18   do that?

19           Q    And you said, yes?

20           A    I said, yes.

21           Q    And to your knowledge, when the police came,

22   they interviewed everyone.  And at some point, they asked

23   Mr. Collin if he wanted to press charges.  And to your

24   knowledge, he also said yes?

25           A    That particular day all three individuals

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                              Herbert L. Mitchell

Page 51

1    disappeared from the property.   Maurice Collin left

2    immediately.   Patty Matulis left immediately.   And

3    Maurice Collin left immediately.   I was told by the

4    police officer that Maurice Collin had gone to the

5    Newington VA Hospital for emergency psychiatric help.

6              MS. ENGSTROM:   I think you mentioned Maurice

7    Collin twice.   Is there someone else that you forgot

8    to --

9              THE WITNESS:   Maurice Collin, Patty Matulis,

10   and Tasi Vriga.   The police officer stated to Tasi that

11   he wanted him to remain on property.   Tasi left the

12   property.   The Rocky Hill P.D. put a call out for Tasi

13   and told him -- I heard it right over the phone -- the

14   police officer said to him, If you don't return to the

15   property, I am going to charge you with interference.

16   That was Officer Phelps.

17        Q    Did he come back and fill out the statement?

18        A    He came back as far as I know.   What he did

19   after that, I don't know.

20        Q    Do you know if Mr. Tasi ever spoke to Mr.

21   Collin about not pressing charges?   Try to talk him out of

22   pressing charges against of me?

23        A    The only thing that I know about that is that

24   the following Monday when I went down to the office to get

25   permission to go to the Admin, I was walking through the

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                          Herbert L. Mitchell

Page 52

1    hall.  Tasi and Moe were in their office and I heard Moe

2    Collin say to him, Am I going to lose my job, and am I

3    going to get arrested?   And then they heard me walking

4    with my steps.  And I asked them, I said, Excuse me, can I

5    go down to the Administration Office?  They gave me

6    permission and I went down there.

7          Q    Did you know if Mr. Tasi ever tried to talk

8    Mr. Collin out of pressing charges against you?

9          A    I do not know, no.

10         Q    And is it your testimony, sir, that you did

11   not threaten Mr. Collin?

12         A    That is correct.

13         Q    Did you ever file a union grievance about that

14   incident?

15         A    Personally, myself, no.   I asked the union

16   for a grievance and I was told by the union steward that

17   his job is to fill out the grievance and that he was

18   filling the grievance out.  Jim Trench from the union had

19   told him to hold on to it, okay, until they found out what

20   was happening with -- because there was two separate

21   incidents.  One of them terminated me for unwillingness

22   and inability to perform the job.

23         Q    All right.  Other than going to the police

24   department, did you ever make any comments about this

25   incident to anyone else?   Did you ever file a formal

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                          Herbert L. Mitchell

Page 53

1    charge in any other forms?

2              MS. ENGSTROM:    Objection to the form.   Do you

3    mean, whether he talked to his family or --

4              MR. JORDANO:   I'll rephrase it.

5         Q    (By Mr. Jordano) Other than going to the

6    police department did you ever make any other public

7    comments about this incident?

8         A    Oh, yes, I did.

9         Q    To who?

10        A    Numerous people.  I mean, I --

11        Q    People at work?

12        A    People at work, to friends.

13        Q    All right.   Who --

14        A    My family.

15        Q    Who at work did you talk to?

16        A    I talked to Barbara Vaillancourt.   I probably

17   talked to everybody because I was very upset about it.

18        Q    And you were relaying what happened in the

19   incident?

20        A    I relayed that incident to everyone that I

21   could.

22        Q    And you spoke about what happened.

23        A    Yes.

24        Q    And everything that you spoke about, was that

25   particular incident with these people?

Brandon Smith Reporting Service

Mitchell vs Collin, et al

11/26/2003                                      Herbert L. Mitchell

Page 54

```
 1        A     Yes.

 2        Q     Were any other matters discussed that you're

 3   aware of?

 4        A     I don't recall.

 5        Q     Did you talk to Ms. Vaillancourt about

 6   anything other than that incident regarding your

 7   relationship with Moe Collin?

 8              MS. ENGSTROM:   Objection to the form.

 9   Vague.  I mean, what --

10              MR. JORDANO:  If he doesn't understand it, he

11   can tell me.

12        Q     (By Mr. Jordano) Do you understand the

13   question?

14        A     I don't understand.

15        Q     Did you work with Ms. Vaillancourt?

16        A     Yes.

17        Q     During the time that you worked with Ms.

18   Vaillancourt, did you ever discuss your relationship with

19   Moe Collin with her other than that incident?

20        A     Yes, we talked all the time.

21        Q     All right.  What things did you tell her

22   about your relationship with Moe Collin?

23        A     At first, I thought he was standoffish.  He

24   wasn't happy that I was assigned as a VSO officer down

25   there.  He got annoyed with the fact that I asked a lot
```

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 55

1    of questions.    But being that I was brand new, if I don't

2    know the answer to something, I am going to ask you.

3            Q    Okay.

4            A    Probably after about a month, he realized that

5    I was okay in his mind and that I was working very hard

6    and very diligently.  And he was impressed with my

7    knowledge and my demeanor and my relationship with the

8    people.  He said, You know, you're one of the best people

9    that I've had.  You've become the fastest and the

10   quickest.  Everything was really super up until the

11   incident with Barbara and the other VSO officer, Doyle.

12           Q    Let me back up for a second.  So you went for

13   a period that you got along very well?

14           A    Extremely well.  I was helping with new forms.

15   I was offering assistance to put work together, you know,

16   very helpful.  He said, I can't believe that you would do

17   that.  Um, when we went to class at the VA, you know, I

18   said, It would be nice -- they handed us all the loose

19   disorganized stuff from the VA, you know, Hartford, and I

20   said, It would be nice if we make these into booklets and

21   become organized.  And I said, Here, I'll do that.  So I

22   did a couple other guys' in the office also and he was

23   taken back, you know, why you would do these things.  And

24   he had a little bit of a problem, I think, with my giving.

25   Like I would bring, like, coffee and doughnuts and things

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                          Herbert L. Mitchell

Page 56

1    like that and he just seemed uneasy about it.

2              The same thing happened with the lady, um,

3    Ruth Morrison.   I said that I wanted to make it happen as

4    quick as I could.   And I said, You know, I really would

5    like to do something special for her.   I said, Is there

6    any way, you know, if I write the commissioner, can I

7    write the commissioner and ask him if he can invite the

8    secretary or president of Veterans' Affairs to do a

9    presentation to this woman because she was a female

10   veteran of World War I.   And I wrote this letter to the

11   commissioner.   And he said, you're probably wasting your

12   time.   The bottom line was that -- Well, we really don't

13   want to go through all of that -- but the bottom line is,

14   I made it happen.   And the secretary of the VA in

15   Washington, Anthony Principi presented this 102-year-old

16   woman her -- I found the medal she deserved.   And I am

17   the one that found that out.   And then there was also

18   another medal that she was due for as a World War I

19   Veteran.   And they did the presentation with Nancy

20   Johnson and the secretary in Newington.

21              I think that they were a little bit fuddled

22   about my persistence -- I call it "PEP," positive,

23   enthusiasm, persistence -- ability to get things done.   I

24   would get things done and they were amazed as to how did I

25   do these things.   And I think he became a little agitated

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 57

1   like -- I think that he thought that I was trying to go

2   for his job.   And I said to him one day that that is the

3   furthest thing from my mind.   I just wanted to come to

4   work, do my job, and serve the veterans.   And that is it,

5   you know.   I said, that's me.   I am a very giving person.

6   You know, it was kind of, like, you know, not too many

7   people are.

8          Q     When was the incident that you are talking

9   about now?

10         A     When the office -- There has been a battle for

11  years there with George Doyle.   He had been replaced from

12  his previous position and brought to Rocky Hill.   He

13  didn't get along with our employees and you would have

14  to....

15         Q     When was the incident?

16         A     I would have to look at the letter of that

17  statement that I said that I -- it should be in my file.

18         Q     Let me back up.

19         A     I said that I disagree with this entirely.

20  And that I was told by the union steward that once I did

21  that, Moe said to the union steward that that anybody that

22  files a grievance is calling me stupid, and I don't like

23  that.

24         Q     Let me back up for a second.   You had a good

25  relationship with Moe Collins?

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                          Herbert L. Mitchell

Page 58

1          A     Yes.

2          Q     Up until this incident?

3          A     Okay.

4          Q     Describe the incident.  You don't know when it

5    occurred?

6          A     It was in May.

7          Q     May of 2002, you think?

8          A     Yes.

9          Q     Okay.  Tell me what happened on the incident

10   itself?

11         A     Can I refresh --

12         Q     Do you have a copy of the form that you

13   said --

14         A     Yes.

15         Q     Why don't you pull that out for me and I will

16   go and make a copy and then we will mark it.

17               MS. ENGSTROM:   We probably have one here,

18   don't we?

19               THE WITNESS:   You should.

20               MS. ENGSTROM:   What are you looking for?

21               THE WITNESS:   It might have been March.

22               MS. ENGSTROM:   What is it?  A memo or --

23               THE WITNESS:   No.  It is a two page item.

24   And in it I say that I disagree with in it's entirety.

25               MS. ENGSTROM:   Oh, this was a grievance that

b1aca4d3-e62d-4d78-8ee9-f5511053edcc