11/26/2003                                          Herbert L. Mitchell

Page 83

1        A    No, I didn't.

2        Q    Now, I believe that you told me that in July

3    you received a letter saying that you were going to be let

4    go during your working test period.   Correct?

5        A    No.   What happened was Tasi came up to the

6    office when I was working and said be in my office

7    downstairs at 1:00 or 1:30 -- I forget the exact time.

8    And I asked him what for, and he did not respond.   He

9    just walked left and walked down.   I called my union

10   steward and told him that I was supposed to be downstairs

11   at 1:00 and that something was going on.   And he came and

12   went downstairs.   As we were going downstairs, Moe walked

13   out of the facility.   There were three security guards and

14   there was Tasi.   Tasi handed a piece of paper to Steve

15   Kowalski, and said, Read it.   And then he gave me a copy

16   of the letter and said, Read it.   I read it.   It said

17   that I was terminated for inability and unwillingness to

18   perform the job.   I said to Tasi, What was unwilling and

19   inability to perform the job?   I have been told that I

20   have been doing a great job.   You guys were pleased.

21   Not only have you promoted me saying -- not promoting me,

22   but acknowledged that I have been doing a great job, but

23   you brought it up in a several of the monthly VSO

24   meetings.   And if you look at the minutes from the VSO

25   officers' meetings which are held once a month, you may

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                        Herbert L. Mitchell

Page 86

1        Q      All right.

2        A      And I talked to Brian Toolan.

3        Q      When did you talk to Mr. Toolan?

4        A      I went to the VA office -- I mean, to the

5    Veterans Home on the 24th.    And I was told that I was not

6    allowed access to the property.    And I asked him why and

7    he said that he did not know.

8        Q      Was he handling the gate that day?

9        A      No.    It was another guard that was on the

10   gate and Toolan came down.    I had asked if I could speak

11   to the commissioner or the deputy commissioner for

12   security or whoever to find out why I was denied access to

13   to the property.    No reason was given.    They tried

14   calling -- it was about 11:15 or 11:30 and they tried

15   calling the Commissioner, Charlie Williams, I think, and

16   Hugo and got no response.    So I was denied access to the

17   property.

18       Q      What did you talk to Mr. Toolan about that

19   day?

20       A      I asked him if he had been deposed or

21   whatever.  And he said no, he had not.    I told him that I

22   was being deposed today.    And, um...

23       Q      Did you go over his testimony with him?

24       A      Go over his testimony?

25       Q      Go over your testimony with him?

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 101

1    that.

2            Q    All right.    And then -- Let me back up.

3    Other than the form that you signed, Exhibit 8, where you

4    made your handwritten note --

5            A    Uh-huh.

6            Q    -- on the memo on May 10th, and the incident

7    involving you and Mr. Collin on June 21st, were there any

8    other altercations between yourself or issues between

9    yourself and Mr. Collin?

10           A    What specific date?

11           Q    From May 10th when you refused to sign the memo

12   or you signed the memo with a note, Exhibit 8, and the June

13   21 altercation that you alleged -- that you say that you

14   were pushed.

15           A    Okay.

16           Q    Did you have any other incidents involving

17   yourself and Moe Collin?

18           A    I am not sure of the dates, but there were -- I

19   had put down that -- He had taken us out to lunch.    Well,

20   we all went out to lunch down at -- down in Rocky Hill,

21   there is a place for lunch and we all went to lunch.    And

22   when I filled out my time card, I put down that -- we were

23   there for an hour and my lunch is a half hour.    I put down

24   a half hour personal time.    When I submitted that and

25   turned it in, he went bananas.

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 102

1            There was a customer that came to the door one

2    day right about closing time -- we close at 4:30 and it was

3    4:25.   The person came from his job and I spent a half hour

4    with him.   The following day I told Moe that the guy came

5    in, he went to verify with the people in the office that

6    someone did come at 4:25.   He yelled and screamed and went

7    off.   And I didn't understand why and what the problem was.

8    I said, you know, the customer came at 4:25 and I took care

9    of him.   It was a veteran and he needed to be taken care of

10   and I took care of him.   I said, What is the big deal?   He

11   said, Next time you tell him to go home.   And I said, I

12   didn't know that.   And he said, There is no overtime.

13   And I said, I know that there's no overtime.   I have been

14   working overtime and you've been well aware of that.   I've

15   been coming in on holidays and I don't charge for the

16   overtime.   He went ballistic that time.   And then --

17           Q    Excuse me.   Did he tell you that he was

18   concerned that the union might file a grievance for

19   overtime if you were working beyond the eight hours?

20           A    No.   He just stated that there was no overtime

21   and you're not going to get overtime.   And I said, I never

22   have collected overtime ever since I have been here.   And

23   you have been aware that I've worked longer or shorter, or,

24   you know, as far as the time that I've worked, the hours

25   that I was supposed to be working.

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 103

1        Q     When you were at UPS, did any employees ever

2    file grievances saying that they were entitled to overtime?

3        A     Oh, yes.

4        Q     And you had to deal with that?

5        A     Most certainly.  If they had overtime coming

6    and the grievance was correct, they got paid.

7        Q     Okay.  So you can understand the sensitivity

8    regarding about people working over, especially union

9    people?

10       A     Each case is different depending on the

11   circumstances that occur.  If you had a vehicle that breaks

12   down and you put in a requirement that you're only to work

13   ten hours and the person works ten and half and it comes

14   off in a specialized report, you're going to have

15   circumstances where you're going to have to be human

16   whether it's weather or whatever it may be.

17       Q     Was it your experience that with the people at

18   UPS, that if they work over whatever they were supposed to,

19   they expected overtime.  And if they didn't, they would

20   grieve it?

21       A     That's correct.  They would get their time

22   paid.  They are entitled to pay by law.

23       Q     And whether or not they were entitled to

24   overtime was on a case-by-case basis; is that correct?

25       A     Yes.  Well, Moe had stated earlier that we

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                                  Herbert L. Mitchell

Page 104

1    could do flex time.    That if we got carried over or

2    whatever, that if we did a half hour, you could come in a

3    half hour early or whatever.    But at that particular time,

4    he just, for whatever the reason, he lost his cookies.

5          Q    Go on.

6          A    Um, there was another time where he locked the

7    door -- but that was after the incident occurred.    When I

8    was brought back on the property, I was told that

9    everything was supposed to be right, okay.    I was supposed

10   to be given my keys, my passes, and everything.    They held

11   back the stuff so that I couldn't have access to the

12   computers almost until when I was terminated for the

13   layoff.  Well, laid off, not terminated.

14         Q    You're saying that for several months you

15   didn't have access to the computer?

16         A    That's correct, yes.    And when I said the

17   computer guy why I didn't get my keys, he said that it was

18   Moe Collin.    He said that it only takes two days to get

19   the computer pass.

20         Q    You mean a password?

21         A    This little electronic thing that gives you

22   eleven digits that you have to access into the Federal VA

23   System.  You have a couple of seconds to put that into the

24   system, okay.  So I couldn't do any of my computer work the

25   entire time that I came back.

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                      Herbert L. Mitchell

Page 129

1    think there was Bob Silvester.    I think Barbara

2    Vaillancourt, Moe, Tasi, Aileen Cantin.    I would have to

3    check my notes to see who else was there.

4         Q    Did your letter of termination reference your

5    interpersonal relationship with your supervisor?

6         A    I would have to check that.    I don't know off

7    the top of my head.

8         Q    Did you believe that the incident of June 21st

9    2002 had any bearing on your termination?

10         A    I believed that they came up with this

11    fictitious thing of unwillingness and inability to perform

12    the job in disguise of... Because I was going to be

13    terminated -- not terminated, but because of the incident

14    where he put his hands on me -- I believe that they made

15    this thing up stating inability and unwillingness to

16    perform the job.    And they thought that I would be gone

17    and never seen again and that would be it.    And that they

18    wouldn't have to worry about the workplace violence or

19    anything else.    And that proves the fact that how they

20    take the keys, the computer system, and everything, and

21    deleted everything out from me as if I was a person that

22    was never coming back.    When I was terminated the second

23    time, nobody asked me for my keys or for my ID.

24         Q    You mean, when you were laid off?

25         A    Yes.

Mitchell vs Collin, et al

11/26/2003                                              Herbert L. Mitchell

Page 130

1      Q    Well, did you turn in your ID?

2      A    No, I still have it.

3      Q    Your keys to the building?

4      A    Yes, I think so.

5      Q    You think that you still have those?

6      A    Yes.  I think I have everything.  I think

7    that I have everything.  I have the computer thing and

8    everything.  Nobody ever asked for it.

9      Q    I thought that they never gave you the

10   computer chip after you came back?

11     A    I told you, just before I got laid off.

12     Q    They gave it to you?

13     A    Yes.  And I asked the guy that gave it to me,

14   I said, How long does it take to get this?  He says, two

15   days.  And I said, Well, who... And he said, Moe Collin.

16     Q    Who is that?

17     A    Oh, what is his name?  I can find out his

18   name, but I don't know offhand.  I didn't deal with him

19   that many times.

20     Q    Okay.  Now, let's go back to Exhibit 13.

21   Now, you told me about the report from the security office

22   that you believe was made and then was deleted, right?

23     A    Yes.

24     Q    And it is your testimony that Mr. Toolan has a

25   copy?

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                        Herbert L. Mitchell

Page 131

1        A     No.  I mean, Brian Toolan has a copy, correct.

2        Q     Right.  And he has never given you a copy?

3        A     He's never given me a copy, correct.

4        Q     Okay.  And when you spoke to him the other

5    day, you didn't ask him for a copy of it?

6        A     No, I didn't ask him for a copy the other day.

7    Previously, I had asked him for a copy.

8        Q     And did he refuse to give it to you?

9        A     One time he said that he lost it.  And I went

10   to meet him and something came up, and it didn't happen.

11   You know, it didn't happen.

12       Q     Have you ever --

13       A     So I didn't push him for it because he had

14   talked to the attorney and told her the story of what

15   happened, okay.  And he told them everything that I had

16   stated.  And he told her everything over the -- on a

17   telephone conversation.

18       Q     You mean with your attorney?

19       A     My attorney, which was Cathy Eldergil.

20       Q     Your first attorney?

21       A     Yes.  And he told her exactly what had

22   happened.  And she recommended that we don't push him

23   because --

24             MS. ENGSTROM:  This is all attorney/client

25   privilege, what you said to Cathy.  So I would suggest

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 132

1    that you don't waive that, okay.

2        Q    (By Mr. Jordano) I don't want to inquire about

3    the conversation with Attorney Eldergil.  All I know is

4    that you told me that they talked.

5        A    Right.

6        Q    Now, you say that Mr. Vriga submitted a false

7    report to the Rocky Hill Police Department.  False, from

8    the standpoint that his version is different than yours of

9    what happened that day?

10       A    Of what happened and that he had changed his

11   numerous times.  The first time that he had written one

12   is -- I don't know if you have a copy of his first witness

13   statement.

14       Q    Go ahead and tell me.

15       A    It was just written on a little piece of

16   paper.  Even the police had to have him come back

17   numerous times because his stories just didn't gel.

18       Q    So you are saying that there are a series of

19   statements by him that are inconsistent?

20       A    Yes.

21       Q    Or that they couldn't read his writing?

22       A    Uh, both.

23       Q    Okay.  We talked about Mr. Toolan -- paragraph

24   13 was about Mr. Toolan's report of the conversation that

25   you overheard.

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 133

1       A      Which one.

2       Q      Paragraph 13.

3       A      Okay.

4       Q      And that was what you told me about earlier --

5       A      Yes.

6       Q      And that's where you overheard the

7    conversation --

8       A      Yes.    And he was told by the chief of

9    security, Hugo Adams, to hand that copy over to me by 3:00

10   on that Thursday.

11      Q      Okay.    And you claim that -- Now, did you

12   speak with Mr. Dunn?

13      A      No, I've never spoken with him.

14      Q      In paragraph 14 you allege that you learned

15   that the report was ordered to be concealed from the

16   plaintiff and personally deleted from the department's

17   computer system.    Tell me the basis of that allegation if

18   you never talked to him?

19      A      Brian Toolan told me that when he puts it in

20   the computer, it goes right into Dunn's office and Dunn

21   has it under lock and key and he is the only one that

22   knows his password and has access to that thing.    He told

23   me that he had deleted it off of his computer, but that he

24   had made a copy of it and that he had changed the logbook

25   for that particular day for the entries that you're

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                Herbert L. Mitchell

Page 134

1    supposed to make.

2              Plus the fact is that his security supervisor,

3    or chief of security, Hugo Adams, had told him three times

4    to change his statements.   Part of the statement changes

5    were in regards to -- it was stated that Maurice Collin

6    went to the VA Hospital for psychiatric help, emergency

7    psychiatric help.   And then he changed it to that he went

8    there to receive medical help.   And then he was told,

9    oh, no, just put down that he had an appointment.

10        Q    Do you know what the federal regulations are

11   in regards to the disclosure of health information about

12   people?

13        A    Um, I have a pretty good idea of what it --

14        Q    Do you know if it was proper for someone to

15   comment about someone's psychiatric care in a written

16   report?

17        A    If that's a statement that someone said and

18   his thing was to write up what he heard, I don't think

19   that that's illegal to do that.

20        Q    Okay.

21        A    But I could be wrong.

22        Q    And you told me that -- Now, did you get a

23   copy of the police reports?

24        A    No, not initially.   I had requested it.   It

25   was taking a long time and I asked if I could have a copy,

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                      Herbert L. Mitchell

                                                                        Page 137

1        A    Yes, I did.

2        Q    So your son was covered?

3        A    Yes.

4        Q    And then in October of 2002, pursuant to the

5    stipulated agreement, you were reinstated.   Correct?

6        A    Yes.

7        Q    And I think you told me that you got all of

8    your back pay and benefits?

9        A    Well, my benefits, I think, were covered as

10   far as I know.

11       Q    Okay.  Were you reimbursed for the COBRA

12   premium that you paid?

13       A    To be honest with you, I am not sure.

14       Q    Then you worked, from that time, as a regular

15   employee, until January or at some time in 2003 when you

16   were laid off, right?

17       A    Yes.

18       Q    When you were laid off in 2003, did you elect

19   the COBRA Benefits?

20       A    I had the COBRA Benefits -- Well, it was like

21   a six month thing that they had where they would take care

22   of it because of this layoff situation.

23       Q    All right.  So they gave you six months of --

24       A    And then they had a COBRA thing and then I

25   elected not to take it because of the money.  I think it

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 138

1    was over a thousand dollars.

2         Q    Okay.  So when you were laid off in 2003, they

3    gave you six months of health benefits paid by the State?

4         A    Yes.

5         Q    And then you elected not to take the COBRA?

6         A    Yes, sir.

7         Q    Okay.  Tell me what other economic loss you

8    are claiming?

9         A    Any pay that I would have incurred.

10        Q    From when?

11        A    From the time that I was laid off.

12        Q    All right.  You are claiming that you were

13   laid off --that your layoff --

14        A    I claimed that it was basically retribution

15   because of what happened previously.

16        Q    And what are you referring to?  What

17   specifically are you saying?

18        A    I am saying that the layoff -- we were told

19   that we would not be laid off.  I should be working.

20        Q    All right.

21        A    That they laid me off because of what occurred

22   and not because of the budget crisis.  Because we were

23   told -- I took two courses at Gateway Community College

24   one in the sociology and another one in drug and alcohol

25   abuse to be like a counselor because of the veterans, a

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc

Mitchell vs Collin, et al

11/26/2003                                                    Herbert L. Mitchell

Page 139

1    lot of them have drug and alcohol problems, okay, to get a

2    better insight of those veterans so that you can help

3    them.   That was a part of my agreement that they wanted me

4    to have fifteen credits.   So you know, I signed up for

5    college and I went under the VA benefits for that and I

6    got an A and B in those two courses.   And I was following

7    everything, and we were told that we would not get laid

8    off.

9              The jobs that were eliminated, were the

10   people, myself and Barbara and then one other person,

11   okay.   Barbara's job was eliminated I feel because she

12   was -- she had gone and testified on my behalf on a couple

13   cases and they were very upset with her about it.   So

14   they eliminated her position and never filled it.   They

15   currently have that position filled.

16             Q    Okay.   The secretary's job?

17             A    The secretary's job they have filled part-time

18   with a veteran who's in the home and they are paying him

19   to do her particular work.   And he has access to medical

20   records, all of the records including his own.   And he is

21   doing her work.   And by the union, that should be a union

22   grievance and they should have hired someone to do that

23   particular job.

24             Q    But you weren't a secretary?

25             A    Um....

Brandon Smith Reporting Service

b1aca4d3-e62d-4d78-8ee9-f5511053edcc